# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

**17-354**

**STATE OF LOUISIANA**

**VERSUS**

**WILLIAM FELIX VAIL**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 1699413
HONORABLE ROBERT LANE WYATT, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

## ELIZABETH A. PICKETT
## JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Elizabeth A. Pickett, D. Kent Savoie, and Van H. Kyzar, Judges.

**CONVICTION AND SENTENCE AFFIRMED WITH INSTRUCTIONS.**

**John F. DeRosier**
**14th JDC District Attorney**
**Carla S. Sigler**
**Karen C. McLellan**
**Assistant District Attorneys**
**P. O. Box 3206**
**Lake Charles, LA 70602-3206**
**(337) 437-3400**
**COUNSEL FOR APPELLEE:**
　　**State of Louisiana**

**Chad M. Ikerd**
**Louisiana Appellate Project**
**P.O. Box 2125**
**Lafayette, LA 70502**
**(225) 806-2930**
**COUNSEL FOR DEFENDANT-APPELLANT:**
　　**William Felix Vail**

**PICKETT, Judge**

## FACTS

On October 30, 1962, Mary Horton Vail's body was recovered from the Calcasieu River. Her husband, William Felix Horton, had reported to the local authorities in Lake Charles that he and his wife had been in a boat on the river at night, checking trot lines, when his wife accidently fell out of the boat and drowned. The investigating officers were suspicious of Mr. Vail's account of how he claimed the incident occurred based on what they viewed as inconsistencies between what he reported to them and physical findings on the boat. Mr. Vail was arrested and charged with his wife's murder. The coroner, however, concluded the manner of death was accidental drowning. When this matter was presented to a grand jury the matter was ultimately pretermitted. Having failed to secure an indictment, the state dropped the charges pending against the defendant.

Throughout the ensuing years the matter continued to be investigated, off and on, both by law enforcement and private investigators. Additional evidence was gathered which the state believed to be both relevant and significant.

On June 27, 2013, a second grand jury indicted the defendant for the 1962 second degree murder of his wife, Mary Horton Vail, committed in violation of La.R.S. 14:30.1.

Trial commenced on August 8, 2016. On August 12, 2016, the jury returned a verdict of guilty of Second Degree Murder against the defendant. On September 21, 2016, the defendant filed a "Motion and Memorandum Regarding Sentencing." The defendant was subsequently sentenced, on September 26, 2016, to life in prison without the benefit of parole, probation, or suspension of sentence. On September 29, 2016, the defendant filed a "Motion to Reconsider Sentence" which was denied without a hearing.

The defendant appeals both his conviction and sentence.

## ASSIGNMENTS OF ERROR

1. The State failed to sufficiently prove Felix Vail was guilty of murdering his wife.

2. A Presumption Wrapped in a Probability: the trial court erred by allowing the State to offer unproven "other bad acts" evidence by use of "the doctrine of chances."

3. The trial court erred by failing to properly instruct the jury as to the burden of proof required before the other crimes evidence could be considered.

4. Conviction by Deposition: The trial court erred in declaring key State witnesses unavailable for trial when they were merely inconvenienced by having to appear at trial, and allowing their prior depositions to be admitted by video at trial.

5. Conviction by Misrepresentation: The trial court erred in denying the defense's motion to suppress the evidence of Gina Frenzel on grounds the motion was untimely—not on the merits— when the defense established "good cause" for the late filing.

6. The 54-year delay in prosecuting this case was prejudicial to Felix Vail. The delay violated his rights to a fair trial.

7. The trial court's sentence of life, because the previous sentence was unconstitutional, was an ex post facto increase in punishment and a violation of the Separation of Powers. Therefore, the only constitutional sentence was to the maximum for the next lesser included sentence of manslaughter.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed by this court for errors patent on the face of the record. After reviewing the record, we find one error patent concerning the information given to the defendant by the court regarding the time limitation for filing an application for post-conviction relief.

The court improperly advised the defendant that he has "two years from today's date and the sentence becoming final to file for post-conviction relief." Louisiana Code of Criminal Procedure Article 930.8 provides that the prescriptive

2

period for filing post-conviction relief is two years, and it begins to run when the defendant's conviction and sentence become final under the provisions of La.Code Crim.P. arts. 914 or 922.

The trial court is instructed to correctly inform the defendant of the provisions of Article 930.8 by sending appropriate written notice to the defendant within 10 days of the rendition of this opinion and to file written proof in the record that the defendant received the notice.

In addition, neither the court minutes nor the sentencing transcript reflect that the court specified the life sentence imposed is to be served at hard labor. However, the exchange at sentencing between the court and defense counsel clearly reflects an understanding by all parties that the sentence is a hard labor sentence. Accordingly, the trial court is instructed to correct the court minutes to reflect that the defendant's sentenced is to be served at hard labor.

## ASSIGNMENT OF ERROR NUMBER ONE

The defendant argues that the evidence submitted at trial was insufficient to prove that he murdered his wife, Mary Horton Vail. He argues the evidence in this case is entirely circumstantial, the state failed to exclude every reasonable hypothesis of innocence, and that Mary Horton Vail's death was accidental.

In *State v. Williams,* 13-497, pp. 3-5 (La.App. 3 Cir. 11/6/13), 124 So.3d 1236, 1239-40, *writ denied,* 13-2774 (La. 5/16/14), 139 So.3d 1024, this court discussed the standard of review for sufficiency of evidence, as follows:

> In *State v. Bryant*, 12-233 (La.10/16/12), 101 So.3d 429, the Louisiana supreme court addressed the sufficiency of the evidence claims, reiterating that the appellate review of such claims is controlled by the standard enunciated by the United States Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). *See State v. Captville*, 448 So.2d 676 (La.1984). In applying the *Jackson v. Virginia* standard, the appellate court must determine that, when viewed in the light most favorable to the prosecution, the evidence is "sufficient to convince a rational trier of

3

fact that all of the elements of the crime had been proved beyond a reasonable doubt." *Bryant,* 101 So.3d at 432. *See also* La.Code Crim.P. art. 821.

In *State v. Spears,* 05-964, p. 3 (La.4/4/06), 929 So.2d 1219, 1222-23, the supreme court stated that:

> constitutional law does not require the reviewing court to determine whether it believes the witnesses or whether it believes that the evidence establishes guilt beyond a reasonable doubt. *State v. Mussall,* 523 So.2d 1305, 1309 (La.1988). Rather, the fact finder is given much discretion in determinations of credibility and evidence, and the reviewing court will only impinge on this discretion to the extent necessary to guarantee the fundamental protection of due process of law.

"Evidence may be either direct or circumstantial." *State v. Jacobs,* 07-887, p. 12 (La.App. 5 Cir. 5/24/11), 67 So.3d 535, 551, *writ denied,* 11-1753 (La.2/10/12), 80 So.3d 468, *cert. denied,* --- U.S. ----, 133 S.Ct. 139, 184 L.Ed.2d 67 (2012). We note that, whether the conviction is based on direct evidence or solely on circumstantial evidence, the review is the same under the *Jackson v. Virginia* standard. *State v. Williams,* 33,881 (La.App. 2 Cir. 9/27/00), 768 So.2d 728 (citing *State v. Sutton,* 436 So.2d 471 (La.1983)), *writ denied,* 00-99 (La.10/5/01), 798 So.2d 963. Circumstantial evidence is that where the main fact can be inferred, using reason and common experience, from proof of collateral facts and circumstances. *Id.* Where the conviction is based on circumstantial evidence, in order to convict, "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." La.R.S. 15:438.

In *State v. Chism,* 436 So.2d 464, 469 (La.1983) (citations omitted), the supreme court discussed the use of circumstantial evidence, stating:

> Circumstantial evidence involves, in addition to the assertion of witnesses as to what they have observed, a process of reasoning, or inference by which a conclusion is drawn. Like all other evidence, it may be strong or weak; it may be so unconvincing as to be quite worthless, or it may be irresistible and overwhelming. There is still no man who would not accept dog tracks in the mud against the sworn testimony of a hundred eye-witnesses that no dog passed by. The gist of circumstantial evidence, and the key to it, is the inference, or process of reasoning by which the conclusion is reached. This must be based on the evidence given, together with a sufficient background of human experience to justify the conclusion.

Consequently, before a trier of fact can decide the ultimate question of whether a reasonable hypothesis of innocence exists in a criminal case based crucially on circumstantial evidence, a number of preliminary findings must be made. In addition to assessing the circumstantial evidence in light of the direct evidence, and vice versa, the trier of fact must decide what reasonable inferences may be drawn from the circumstantial evidence, the manner in which competing inferences should be resolved, reconciled or compromised; and the weight and effect to be given to each permissible inference. From facts found from direct evidence and inferred from circumstantial evidence, the trier of fact should proceed, keeping in mind the relative strength and weakness of each inference and finding, to decide the ultimate question of whether this body of preliminary facts excludes every reasonable hypothesis of innocence.

In the instant case, the defendant was convicted of second degree murder. The definition of a second degree murder is the killing of a human being when the perpetrator specifically intends to kill the victim or to inflict great bodily harm, and the victim dies as a result of the injuries inflicted La.R.S. 14:30.1.

The testimony and evidence presented by the state to the jury was as follows:

Dr. Terry Welke, the Calcasieu Parish Coroner, was the first to take the stand. The doctor testified that he has been a forensic pathologist since 1986 and has qualified as an expert in forensic pathology approximately two hundred seventy-five times. He has performed approximately seven thousand autopsies during his career. Dr. Welke testified that he had reviewed the 1962 autopsy report which was prepared by Dr. Avery Cook, who was deceased at the time of trial. Dr. Cook, although a pathologist, was not a forensic pathologist. Dr. Welke noted that while the autopsy report described the external and internal condition of the body, the report did not list the manner or cause of death. The death certificate, however, listed the cause of death as drowning and the manner of death as accidental. The

death certificate was filled out and signed by the coroner at the time, Dr. Snatic, who was neither a pathologist nor a forensic pathologist.  Dr. Welke also viewed two photographs taken of the victim immediately after she was pulled out of the water.  Dr. Welke testified that from the information he received after viewing the photographs, together with his vast experience with handling drowning cases, he did not believe that Mary Vail died from drowning. It was his opinion that she was dead before she went into the water.

Dr. Welke noted that the body came out of the water rigid and face up, with her arms crossed over her abdomen.  He explained that after death, a stiffening of the muscles develops, generally known as rigor mortis.  Over a period of time, however, the muscles become flaccid. The duration of the stiffness depends on various factors, including air or water temperature.  The doctor explained that when a person drowns and starts to decompose, he or she floats up to the surface face down, arms and legs down, shoulders and back up, in a "dead man" position He stated that "[t]he cooling effect of the water slows down the decomposition which helps maintain her rigidity because it takes longer for the rigidity to disappear; and that was part of my consideration when I made my determination three years ago."  The doctor stated that a drowned person may come to the surface belly first but this would only happen in advanced decomposition "[w]here they look like they could fly around the room backwards because they look like a balloon that's over-distended, you did not see people coming out of the water stiff and especially in what I call a coffin position."  The doctor noted that the body in the pictures he saw was not in an advanced state of decomposition.  The doctor illustrated the dead man's position with photographs of several drowned persons in the water.

Dr. Welke noted that the autopsy report indicated there was some lividity or discoloration on the victim's face, chest and stomach. He explained that after death, the blood will pool towards the down side of the body. Dr. Welke explained that if the body is rolled into a different position, the blood will migrate to the down side. The migration of blood will occur until the blood finally gels. The fact that the lividity was on the front, or anterior part of the body, was not inconsistent with the doctor's conclusion that the victim was dead when she entered the water. To further support his theory that Mary Vail was dead when she went into the water, Dr. Welke noted that there were dark stains or streaks on her white sweatshirt, across her arms, hands, and chest area. The doctor thought her sweatshirt came out of the water too clean and the stains were not mud but some kind of petroleum product which would not have dissolved in the water. He speculated that after Mary Vail was killed, a tarp or canvas of some kind was placed over her or that what she was laid on had a greasy or oily compound on it. He conducted an experiment where he had his wife dress in a white, long sleeve shirt, lay down in the position Mary Vail was in when her body was pulled out of the water, and he pressed a painted piece of cardboard over her body. The doctor stated he was impressed by how the paint transfer onto his wife's body was duplicative of the stains seen on Mrs. Vail's shirt, arms, and hands. Pictures of this experiment were compared with the pictures of Mary Vail's body. The pictures were published to the jury.

While Dr. Welke could not state what caused Mary Vail's death, he stated he was one hundred percent certain the manner of death was homicide. The doctor suggested that maybe because there was a scarf wrapped around her neck and over her mouth when Mary Vail's body was pulled from the water she could have been strangled or suffocated. Moreover, the autopsy report indicated there was a fairly

7

significant bruise on the side of Mary Vail's head which might indicate that she received some kind of head trauma, which may have precipitated her death.

A video deposition of Isaac Abshire was played for the jury. Mr. Abshire was deceased at the time of trial. The state filed a motion to perpetuate the testimony of Mr. Abshire for trial purposes.[1] The motion was heard on June 18, 2013. The trial court granted the state's motion to perpetuate the testimony and to allow state's Exhibits 1 and 2, photographs of Mary Vail after she was pulled out of the water, and Exhibit 3, a summary of the police investigation, dated October 28, 1962, to be admitted for trial purposes.[2] A transcript of the deposition was also submitted to the jury.

At the time of the deposition, Mr. Abshire was ninety years old. Mr. Abshire stated that before marrying Mary Vail, the defendant had lived with him for some time. Mr. Abshire testified that at the time, he was aware of problems between the defendant and the victim. The defendant and Mary Vail had a baby son, but the defendant was not happy with having a child. The day before Mary Vail died, she was mad at the defendant. Mr. Abshire said it had something to do with another woman. On Sunday, October 28, 1962, Mr. Abshire heard that Mary Vail had drowned. Along with others, Mr. Abshire took a boat and helped search for Mary Vail's body along the river at the north end of Ryan Street. The next day, the body was located in the water. Mr. Abshire stated that the body was not slumped over in the water; it was "kinda laying on her side or kinda on her back like." He said she was face up and her arms were folded across her abdomen. He stated that the body was stiff when it was raised into the boat on a stretcher. He

---

[1] Neither the motion to perpetuate testimony nor the trial court's order to hear the motion is in the record before this court.

[2] State's Exhibits 1 and 2 submitted at the perpetuation of testimony hearing were pictures of the victim after she was pulled from the water, which Dr. Welke also identified at trial as State's Exhibits 1 and 2.

said there was a scarf wrapped tightly around her neck and across her mouth. Mr.

Abshire testified that he was eventually given the two photographs of Mary Vail

after she was pulled out of the water, a summary of a police investigation report,

the coroner's report, and other documents. The police investigation summary

report, compiled by detectives with the Calcasieu Parish Sheriff's Office,

established the concerns and direction of the police investigation into Mary Vail's

death at the time, as follows:

> SUMMARY OF INVESTIGATION OF DROWNING OF <u>MARY ELIZABETH VAIL</u>, WHITE FEMALE, 22 YEARS, 922 CLEVELAND ST., LAKE CHARLES, LA.
>
> There is on file a report of the initial investigation entitled "Drowning", dated October 28, 1962.
>
> On Monday, October 29, 1962, I contacted the Husband of the deceased, William Felix Vail, at the scene of the drowning and requested that he come in to the Sheriff's Office and give a statement of the circumstances surrounding his Wife's death. At 11:50 AM Monday October, 29 William F. Vail gave a written statement and signed it, in the presence of William Perry and Leroy Authement. This statement was taken in shorthand originally and immediately afterward transferred into a typewritten statement by Mrs. Dee Houston.
>
> After Vail signed the statement he accompanied Deputies Perry, Manuel and Authement to his boat stall at Shell Beach Pier. The above Deputies viewed the boat and observed contents as follows; one six gallon outboard motor gas tank, two cushion type life preservers, a pair of brown leather gloves, a poncho type raincoat, boat paddle, and a metal fishing tackle box. The tackle box contained, among other fishing gear, one coiled trot line. This tackle box and boat paddle was [sic] confiscated as evidence. While the above examining the boat the Vail Subject demonstrated the position that his gas tank was supposedly in when his motor stalled. It was noted that in the positon demonstrated it was possible to pump gas from the tank with the manual primer.
>
> Upon further interview after examining the boat it was learned that Mr. Vail had his Wife insured to $50,000.00 with the Wasey Company. At approximately 1:30 pm this date Mr. Breaux with the John L. Wasey, Inc., Insurance Company, 1032 Ryan St., Lake Charles, La., contacted and he advised that Mr. Vail, on June 1, 1962, was issued a $50,000.00 accidental life insurance policy on his Wife, Mary Elizabeth Vail, through Traveler's Insurance Co.

On October 30, 1962 the sheriff's office was notified at approximately 3:30 PM that the body of Mary Elizabeth Vail had been recovered (See supplementary report of "DROWNING OF Mary Vail", dated October 30, 1962). At approximately 4:00 PM Deputies Mazilly, Manuel and Authement boarded the Sheriff's Dept. boat, CP27, on the river road approximately 1/4 mile west of Ryan Street and viewed the body. It was observed that the body was clothed in white tennis shoes, blue jeans, and white sweat shirt, and a dark colored scarf around her neck and chin. Photographs were made of the body at this time by Deputy Murphy. Dr. Snatic also accompanied the above to view the body and ordered the body moved by Hixson Ambulance to Hixon Funeral home where an autopsy was performed by Dr. Avery L. Cook. On this date the clothing of Mrs. Vail was received as evidence by Dep. Authement and on 10-31-62 was turned over to Dep. Ellis.

On October 31, 1962 the following witnesses were interviewed; (1) Jack M. Wier, Personnel Supervisor, PCI, (2) Ike Abshire, Jr., (3) Sylvia Hidalgo, and (4) Betty Payton.

On November 1, 1962 the following interviews were conducted; (1) Jennette McCain, (2) Jean Dailey, (3) Willy Ray Jordan, (4) Norma Kee, (5) Donald Glenn McCullough.

On November 2, 1962 the following interviews were conducted; (1) Henry Chevalier, (2) Mrs. Patricia Odom.

On November 3, 1962 interviews were conducted with (1) Mrs. Joyce C. Thibodeaux, (2) Judith Lynne Boyer, (3) Mr. and Mrs. Joseph A. Borel, (4) Mr. and Mrs. Don Steicken, (5) Amelia Franklin, and (6) Maylan Soileau. (see summaries of all of above interviews attached to this report)

During the invterview [sic] with Norma Kee it was learned that Mary Vail was wearing an off-white leather jacket, sorority sweat shirt, blue jeans and white sneakers when she left her home on Sunday just prior to her death. Norma Kee was babysitting for the Vails when they left home. We also learned from this witness that William F. Vail had an $8,000.00 life insurance policy on his Wife Through Allstate Insurance Co. (See interview with Mr. Henry Chevallier on November 2, 1962.)

On November 4, 1962 at approximately 3:15 PM William F. Vail was arrested at PCI by Deputies Perry and Authement. The subject was returned to the Sheriff's Office and interrogated in reference to apparent discrepancies in his statement and after failing to give reasonable explanations was booked into the Parish jail at approximately 9:10 PM that date.

On the follwoing [sic] day, November 5, 1962 the subject was again interrogated for approximately during which time he was requested to take a polygraph examination and refused.

The following day, November 6, Mr. Vail's Aunt and Uncle, Mr. and Mrs. Finney were allowed to visit with Mr. Vail during which time he told them that he would take a polygraph examination the following morning. The next Morning November 7, 1962 the Vail subject again refused to take a polygraph examination after which he was released from jail.

During this period of interrogation the Vail Subject was questioned concerning the following points:

1. The fact that it was unlikely that his Wife would have been sitting on the back rest of the boat seat when she was not wearing a life preserver even though she had a great fear of water and could not swim.

2. The probability that had he maneuvered the boat as he had stated his Wife would have fallen differently.

3. The fact that he observed and passed up a lighted tug boat in the vicinity of the drowning without requesting assistance even though according to his own admission he did not panic and remained calm throughout the entire sequence of events and remembered every thing that happened.

4. The fact that he passed other lighted locations where he could have requested assistance but did not.

5. The probability that his boat motor would have continued to run even though his gas tank had turned over as indicated.

6. Why his gas tank was not sitting in the place provided for it in the boat.

7. The fact that his trot line, which he had just taken up from the river, was coiled and in his tackle box.

8. The fact that he had just recently purchased a $50,000.00 accidental life insurance policy on his Wife in addition to the $8,000.00 double indemnity policy that he already had on her.

9. The fact that he had made statements to the effect that he did not love his Wife, the [sic] she was stupid and at times he thought she looked vulgar.

10. The fact that on different occasions he had had sexual relationships with other females and at least one male.

11. The fact that a majority of the witnesses interviewed felt that he was capable of killing his wife.

12. The fact that by his own admission this was the first time that he ever taken his wife in the boat on the river at night to run the trot line.

13. The fact that, even though he was behind with most of his major financial obligations, he was able to pay the entire annual premium on the $50,000.00 life insurance policy on his Wife.

14. The fact that he stated that his Wife was wearing the leather jacket when she fell in the water but that the body did not have a leather jacket on when recovered.

15. The fact that he could not present a reasonable explanation as to why he refused to take a polygraph examination.

This interrogation was conducted by Deputies Perry, Manual, Ellis, and Authement.[3]

Mr. Abshire did not state why he was given the documents, but he said he had kept the documents. Mr. Abshire further stated that he was convinced the defendant killed Mary Vail. The defendant threatened to sue him if he did not stop telling people he killed her, but shortly thereafter the defendant left the state.

Sandra Fontenot testified that in 1962 she worked for Ardoin Funeral Home. Mary Vail's funeral was conducted at Ardoin's. Ms. Fontenot identified a letter dated June 17, 1964, which advised the defendant that he still owed Mary Vail's funeral expenses. The letter noted the agreement was that once the insurance company paid Mary Vail's life insurance policy claim, he would settle the bill.

---

[3]After the State and defense rested, prior to closing arguments, all of the exhibits were spread out on a table for the jury to peruse. The trial court gave the following stipulation to the jury:

> In 2012, the latter part of 2013 or the early part of 2013 Mr. Ike Abshire provided to the officials of the Calcasieu Parish Sheriff's Office and the Calcasieu Parish District Attorney's Office a three-page summary of the investigation which he received from the sheriff's deputies. Defense counsel have [sic] had that document since 2013. This document makes reference to other documents which no longer exist.

Ms. Fontenot testified that the defendant never paid the bill. Eventually, Mary Vail's family paid the bill.

Wesley Turnage, who lived in Monpelier, Mississippi, testified that he had known the defendant most of their lives. He stated he grew up with the defendant in Mississippi, where the defendant moved back to in 1964. During a time after the defendant moved back to Mississippi, Mr. Turnage and the defendant worked at the same place of employment. On an occasion when the defendant did not have a ride to work, he rode with Mr. Turnage. During the ride to work, Mr. Turnage said he stated he asked the defendant about his son. The defendant responded that Mary Vail had wanted another child to fix their marriage. Mr. Turnage testified that the defendant became angry and said "'I didn't want the youngin' I got, and I didn't want another one, and fixed that damned bitch. She won't never have another kid.'" Mr. Turnage stated he did not have much to do with the defendant after that. He told his parents what the defendant said but told no one else. He stated he had promised himself that if the matter of Mary Vail's death ever came up, he would report the defendant's remarks. Mr. Turnage said he called the District Attorney's Office after he read about the current indictment of the defendant in the newspaper.

Dee Salador worked for the Calcasieu Parish Sheriff's Office in 1962. She testified that at that time, a person's statement was recorded by a stenographer. She recorded the defendant's statement to the police regarding his wife's death. While the original transcribed statement was lost, she recalled that the defendant claimed that he and Mary Vail were setting out trot lines at night when she fell overboard. He stated that they were alone in the boat. The defendant claimed he tried to save her. Ms. Salador recalled that the defendant did not seem overly emotional about his wife's death. Ms. Salador identified a photograph of the

defendant taken about the time of Mary Vail's death. Ms. Salador remembered that Leroy Authement and William Perry were two of the detectives that investigated the case and that they were conscientious and thorough detectives.

Mary Vail's younger brother, Will Horton, testified that although she could swim in a swimming pool, Mary Vail was terrified of "dark water." Mr. Horton explained that dark water in this case was where the bottom of the river cannot be seen. He stated that the defendant had a boat and that he and the defendant often went skiing in the lake together. Mary Vail never went out in the boat with them. The defendant's and Mary Vail's son, Bill, was only four months old when his mother died. Mr. Horton testified that he made it his duty to ensure Bill knew what a wonderful woman his mother was. Bill Vail died from cancer five to six years before the trial. Mr. Horton stated that he thought it was on a Sunday they got the news of Mary Vail's death. Later, however, he was told it was on a Monday morning that they got the news of his sister's death.

A deputy with the Calcasieu Parish Sheriff's Office in the marine division, Ron Johnson, discussed the river where it passed by the north end of Ryan Street, using an enlarged Google Earth map. He showed the location where the defendant kept his boat on Shell Beach at the time of Mary Vail's death, testifying that it was approximately four miles by the river to where Mary Vail's body was located. He stated that in 1962, there were several all-night businesses located in that area on the river. One was an ice house that was kept well-lit. There were several warehouses along the river's edge, including a Halliburton petrochemical company which ran an all-night operation. Deputy Johnson also testified that he has pulled more than a hundred drowned persons out the water during his career as a marine officer. He stated that even if the body gets into the mud at the bottom of the river, generally as the body rises to the surface, the wave action washes off the mud. He

further stated that almost all of the bodies he had recovered from the water surfaced face down in the "dead man" position.

The state presented the next three witnesses via video depositions, accompanied with copies of the transcripts. The first witness was Robert Fremont. Mr. Fremont lived in San Diego, California, in 1969. He was thirteen or fourteen years old when he met the defendant through Bruce Biedebach, whose brother was dating Mr. Fremont's mother. Mr. Fremont said that he and the defendant took a three-week-long bike trip through California. During the trip, the defendant told Mr. Fremont that he killed his wife. Mr. Fremont stated that he was a little shocked and concerned, and he attempted to distance himself from the defendant. Mr. Fremont stated that even though he was freaked out by the defendant's statement, he did take a second, shorter trip with him to Mexico. Mr. Fremont testified that on this trip the defendant again talked about hitting his wife in the head with an oar, and there was something about a boat:

> A. I remember something about a boat, a lake, something with her head involved and basically something about he disagreed with something that she was doing. And I don't remember the exact thing that it was or things, but something that obviously perturbed him and he didn't agree with, and because of that he felt like it was okay to take her life.

Mr. Fremont stated he had nothing to do with the defendant after this trip. Mr. Fremont stated he did not tell anyone at the time what the defendant said about killing his wife because he did not think anyone would believe him, and he was unsure at the time whether the statement was true. Mr. Fremont testified that about nine months prior to trial, Mr. Biedebach called him and asked if the defendant had ever told him about killing his wife. Mr. Fremont stated that after he heard that two other women associated with the defendant had mysteriously disappeared, he thought it best to come forward with the information.

Jaycine Brooks worked for Traveler's Insurance in the 1960s. She testified that the defendant came into the office within a few weeks after Mary Vail's death. She stated he spoke with an insurance adjustor because there was a problem with the insurance policy he had taken out on his wife. Mary Vail had not signed for the policy. Ms. Brooks had no further information; her office only sold the insurance policies and did not handle claims. However, she stated there was a settlement. She did remember that a deputy from the Calcasieu Parish Sheriff's Office came to the office to inquire about the policy.

Finally, Bruce Biedebach testified he met the defendant at Mission Beach in California. The last time he saw the defendant was in San Francisco in the seventies. Mr. Biedebach testified that one day, the defendant said, "out of the blue" that he killed his wife. When Mr. Biedebach asked what the defendant meant, he was told that the death was ruled an accidental drowning. Mr. Biedebach let it go because he thought that the defendant felt he killed his wife because he was unable to rescue her. Mr. Biedebach never really concerned himself with the defendant's statements, although during their acquaintance, the defendant made the same statement several times—that he killed his wife. Once Mr. Biedebach said he asked the defendant if his wife was a bitch, and the defendant said yes. Mr. Biedebach stated the defendant also mentioned something about the oar causing more harm than help. Mr. Biedebach stated that about five years before the trial, he was contacted by Jerry Mitchell, a reporter for the Clarion Ledger in Mississippi. Mr. Mitchell questioned him about the defendant. Then he spoke with Mr. Fremont and shortly thereafter with the Calcasieu Parish District Attorney's Office.

Gina Frenzel is a private investigator from Texas. She testified that she read an article written by Jerry Mitchell regarding the defendant and the mysterious

disappearance of two women and, sometime in March 2013, offered to help him with his investigation. Ms. Frenzel stated she was able to come into contact with the defendant through an investigation into a fire that had occurred on property the defendant owned a few years prior. She visited with the defendant about four times over a period of six weeks. During conversations with the defendant, Ms. Frenzel stated they spoke about Sharon Hensley in a roundabout way without naming her, and discussed, in generalities, Annette Carver. He never mentioned to her that either woman had "disappeared."

Ms. Frenzel testified she had access to the defendant's house after he was arrested. He had called her from jail and asked her to get his truck out of impoundment, to fix a hole in the roof of his house, and go into his house and throw away perishable food in the refrigerator. She obtained the defendant's truck and returned it to his residence. She went into the house and began to search for journals that she knew he kept. Prior to entering the house, she stated she contacted an attorney and was advised that unless she took something from the premises, she was not violating the law. She said that after a long search she found the journals and took about two thousand photographs of the pages in the journals. Ms. Frenzel testified that the earliest journal she found was from 1984. Ms. Frenzel testified that an entry dated October 25, 2003, from one of the journals may have explained why there were no journals prior to 1984. At the state's request, she read the following:

> 10/28 of 2003 Tuesday at noon. I've just stopped feeding the fire of books and papers from the attic that started about 8:00 a.m. Billy just called and will come this evening if his helper gets back from the doctor in time. I'm going to town and told him I'd be back by 2:00 p.m. or so. I have been finding college and high school notes of mine and bills, love letters and pictures of lovers from years past, books I have to keep, and many more that are burning at the moment. I am working my way through a journal of 89 through 3-90. This is the period where I had left Beth Field because of her whore-swinging

17

stuff and was spending longer and longer periods of time here trying to get daddy off of mother's back. This was a challenging, mind stretching introspective, reexamination time for me. And I was altered by it in a positive way to enable me to handle, without murder, the upcoming debacle with daddy and mother and Kay and Buchie that is just now taking another step towards completion with my moving out of this house. Found stuff from Robin with a couple of guy's names she had marriage offers from while she was loving me and a note saying how devoted to me she was, and that she wanted to ball Brian. Ain't it just the way?

Ms. Frenzel also found copies of letters. She noted one specific letter dated March 1973 from the defendant to his parents, which explained his girlfriend's absence. Ms. Frenzel read a portion of the letter to the jury, as follows:

Greetings. I'm not married anymore. And although she has just been gone two days, my thinking is starting to clear from the clouds that were in her mind. I thought I could get her clear, but I've given up the experiment with her anyway. So now I can begin training full time. I'm also postponing the boat experiment until after the '76 Olympics, then maybe Bill will be big enough to help with it. One more thing about my last wife for your own information and in case her folks inquire. She met a man who has a boat, and although he invited us both, I convinced them I have more pressing things to do at the moment. And so, I sent them off to the ocean and each other with my good wishes and blessing, and I might add, all to my great relief.

Ms. Frenzel testified that a portion of the letter that was redacted indicated it was Sharon Hensley he was calling his wife in the above letter.

Ms. Frenzel also read a copy of a letter the defendant sent to his parents to send to Sharon Hensley's mother.

Dear Mrs. Hensley; I'm in west Florida trying to rebuild a busted motor that blew a piston. And I called one of my sisters in Louisiana who had gotten a letter from my mother saying you had called. I share your concern about Sharon, but then she is of age and she should have the right and freedom from you to decide for herself how she wants to live her time on earth. When and if she contacts you, please write me through my mother, saying where she is, how she is, what she's doing and if she wants to see me. I'll write down all the things I can think of that might help you find her. And since I don't remember your mailing address or phone, I'll mail this to my mother and she will forward it.
. . . .

18

When I saw Sharon last was about a year ago in Key West. We met this couple from Australia who had a boat they were traveling and living on, about 35 or 40 foot, I think. I didn't hear their last names or have the occasion to ask if the boat was registered to either of them. If the boat had some name I didn't see it or hear it mentioned. Anyway, they, John and Vanessa, invited us to marry them and sail around with them. Sharon wanted to and I didn't. They seemed like nice, loving people, but I wanted to wait until we could get our own boat. She seemed to think that I was too much of a straight country boy to evolve at her speed, so she decided to leave me. She also said she was going to try to forget me, her family, and everybody else that she -- that she knew so she should -- could become -- . . . . -- and everybody else that she knew so she could became a new person, clean and free from memory associations. Some kind of Zen/Buddhist thinking Vanessa was experimenting with, I think. If you plan to try to find her against her will, the only possibility I can think of is sailing around looking and talking to other people who are sailing around. I left before they did so I don't know which way they went. They talked of island hopping around South America and the West Indies, and they talked of stopping in Hawaii for a while, maybe a couple years in the Philippines then India, Egypt, and the Mediterranean islands and coast. I don't know how much of which of these, if any, they decided on or in what order. Mr. and Mrs. Hensley, Brian, Rick, Harry, I enjoyed meeting all of you and visiting there. It seem like when I'm not working I travel mostly, so get in touch with my mother if you think I can be an help to you. Although Sharon and me were not legally married we felt completely married to each other. So I feel like a kind of kinship to your family. If she changes her mind and gets in touch please tell her I love her and want to see her. In the spirit of love, health and consciousness, Felix.

Ms. Frenzel found several documents concerning Annette Carver, who married the defendant and a few years later disappeared. Ms. Frenzel identified each document which related the following information: The defendant and Annette Carver were married in August 1983. The defendant was forty-one at the time; Annette was seventeen. Prior to their marriage, Annette and her mother, Mary Carver, purchased a house jointly in Tulsa, Oklahoma, in April 1982. In May 1984, Mary Carver quit-claimed her interest in the property to Annette. In July 1984, Annette conveyed joint ownership in the property to the defendant, and on August 28, 1984, she deeded her interest in the property to the defendant in sole ownership. Annette disappeared shortly thereafter.

During Ms. Frenzel's investigation, she acquired a letter, dated January 19, 1985, that the defendant sent to Annette's mother. Mary Carver had already reported her daughter missing at the time the defendant wrote the letter. Ms. Frenzel read the letter to the jury in its entirety:

Mary, I hope you are healthy and happy and either in love or getting ready for it. I'm not any of these things at the moment, although I'm improving all of them gradually. The emotional detaching process from the intense, loving relationship with Annette that lasted three years is taking a lot of my energy and attention these days and has been making me feel uncommunicative with you because I hold you largely responsible for the relationship ending. You gave Annette a lot of good things and a lot of bad things. The good things I irrevocably love and the bad things stymied the love between us to the point to where we both decided that she could get more (of what she learned was love from watching you) from miscellaneous, emotionally, and sexually hungry men than she was getting from me. I think
[. . .]
I think I've never been so spiritually complete as we were some of the time but the ego hunger for attention and approval that you created in her has an appetite that you thought [taught] her to believe no one can ever fill except temporarily. You [The] spirit-controlled part of her mind knows this belief system about men and love and how to best live life [. . .] she inherited from you and your mother is either a lot wrong or at least is leaving the both of you alone and incomplete a lot of the time. Starting from I think about the time we came back from Costa Rica she began seeing friends and relatives (a few she had been close to including you and your mother) and doing what she called completing her relationships with them for the purpose of getting ready to drop everybody and start over. I agreed with her when she first started this and still do, but since you and your mother apparently stuck for this lifetime in your belief systems about men and sex, that if she never – going to try to live a different belief system with me or anybody, she would have to get you and her mother out of her life.
[. . . ]
In our last conversations with you both - - we tried to make this unnecessary but neither of you indicated to her any intention of changing any of the stuff in your belief systems that she wants to change in hers. We both saw the self-deception in your – I'm not exactly sure what that word is.
[. . .]
I love everybody presentation that you relate most people with. Annette thinks that you – I don't know what that word is.
[. . .]
- - of yourself as a witch who lives with illusions and superior attitude to every person you relate to who accepts and believes your presentation or you wouldn't choose to relate to them. The ego part of her thinks the same way and has ambitions to be better at using people

20

than you are. The spirit part of her is at the same time totally determined to do whatever it takes to become free of some of the things in your value system that she thinks are wrong, even though she has duplicates of them in her own head and emotions. She disappeared herself from you because she realized that you probably would never voluntarily stop reenergizing in her and superimposing on her the same value system you live by that makes her see you and your mother and herself partially as per self image whores --

. . . .

As zero self image whores for approval in the form of male attention as prerequisite to the periodic and temporary permission to feel good about yourselves. She wants to feel good about herself all the time, independent of having people tell here she's talented or sexy or beautiful or smart or spiritual, etcetera. With all my heart I agree with her that she deserves this, and if she achieves it and we meet in the future we might fall hopelessly in love with each other again. We left each other with no plans to communicate in the future unless she can mentally and emotionally evict the ego whore part and became just spirit center. I assure you with all the sympathy I have for as a parent who has been totally rejected and who may realize you could have done better, that I have not the slightest idea where she may have gotten to by now. I will tell you that I love the spirit part and very much respect her right to freedom. And so, I also assure you that even if I did know I sympathize with all the rest of you. Felix.

. . . .

P.S., next page. I have had some good conversations with Scott, and he suggested I send you a copy of the deed so you can see that it was her choice to give the property as a parting gift and partial payment. I think for being her father, lover, teacher, friend, and for assisting her in developing some anonymity and integrity that she feels she should - - she could not have developed without me. If you are feeling remorse as a rejected parent, resentful about her not giving you any more of her money that she did or whatever your motive is for the periodic character defamation campaigns you have been throwing at me, I suggest that you could better fill your mind and time with trying to center your consciousness on health and love and the nature of your spirit. Felix

Brian Hensley, Sharon Hensley's brother, testified. He identified a picture of Sharon Hensley that was taken when she was perhaps 20 years old. Mr. Hensley stated he was twelve years old when he last saw his sister. He described her as a fun-loving, free-spirited hippy. He testified that she and the defendant visited her family in North Dakota in December 1972. While during the time she was with

21

the defendant she had maintained contact with her family, following the December 1972 visit she was never seen again. However, Mr. Hensley's mother received a letter from Sharon about a month later and a phone call from her about six weeks after the December 1972 visit. He did not know the substance of the phone call or the contents of the letter. Sharon Hensley was reported missing to the police and to the FBI in 1973. Mr. Hensley stated he believes that his sister is dead.

Dirk Bergeron, a special agent with the Office of Inspector General of the Social Security Administration testified that according to the information filed with the social security office, the last time employment was reported for Sharon Hensley was in 1971 and in 1979 for Annette Carver. There have been no claims filed for supplemental social security insurance or disability benefits by or on the behalf of either woman. Mr. Bergeron agreed that while it would be very difficult, the two women could have obtained different social security numbers under different names. Dennis Davis is a retired detective from the Tulsa City Police Department. He was assigned to the investigation of Annette Carver's disappearance in September 1984. He worked the case until August 1985. The detective read portions of his supplemental reports, dated December 30, 1984, and January 22, 1985, which contained what the defendant told him about Annette Carver's relationship with him, with her mother, and her disappearance:

> Later that date Felix Vail phoned reporting officer, Felix Vail advised that on or about September 15, 1984 while he and the victim were on vacation in St. Louis, Missouri, the victim decided to leave him. The victim was not mad at Felix, but just wanted to get out of there.
> . . . .
>
> Felix Vail advised he drove the victim to the Trailways bus station in St. Louis. He walked the victim into the station but left before the victim bought a ticket. So Felix Vail does not know if the victim actually bought a bus ticket. Felix Vail states the victim intended to take the bus to Denver, Colorado. There the victim was to buy a bogus ID then head for Mexico. Felix Vail advises the victim's decision to leave for Mexico was no surprise to him because they had been

talking about her leaving for about a month. Felix states that the marriage was not working. Felix Vail and the victim have been married about a year. Felix and the victim lived together for about two years before they were married. Felix Vail advises he and the victim were not mad at each other when they parted ways in St. Louis, and Felix has no hard feelings towards her. Felix Vail also advises that the victim was tired of her family and their interference in her life. And that is another reason why she left. Felix Vail states the victim was going to obtain a false ID in Denver, Colorado because she did not want her family, in parenthesis, (her mother, excetra) to be able to track her down. That is also the reason why she did not tell Felix Vail the whereabouts in Mexico she was headed. Felix advises she has lived in Mexico before and knows some people down there. The victim also supposedly can speak and write Spanish fluently.

. . . .

On 12/30/1984 reporting officer talked to Felix Vail by phone in reference to the money matter brought up by the complainant. Felix Vail advised the victim received $90,000 from her father's estate. He and the victim spent much of the money traveling around in foreign countries. Felix advised they never deposited any of the money in any bank nor did they invest it. They kept the money at home with them. About a month before Felix Vail and the victim went on vacation, the victim deeded the aforementioned property to him because she anticipated leaving. Felix advises the complainant had been $50,000 [sic] with her when he dropped her off.

. . . .

When Felix finally arrived home from vacation he found $10,000 at the residence which the victim had left for him to pay costs of repair to the deeded over property.

. . . .

Vail also offered to leave a picture of the victim with reporting officer. Felix Vail states the victim used part of the money to pay off the complainant's IOUs and that the complainant was upset when the money from her father's estate went to the victim instead of her. Vail believes the complainant's only concern is for the victim's money.

. . . .

According to Felix Vail the victim and he first met in Houston, Texas sometime in 1981 when he doing construction work there and she was a student in an unknown school. After the 81/82 school year the victim came to Tulsa to live with her mother, the complainant, Mary Craver. It is unknown if Mary Craver lived at 1540 East 16th Street at that time or not. Felix Vail advises that the victim lived with her

mother about a month before she called for him to come to Tulsa to pick her up in July or August of '82.

. . . .

Vail came to Tulsa and picked up the victim and they both went to Waco, Texas where they lived together until October '82. At that point they moved to Houston, Texas where they lived until January of '83. Felix Vail advised that at the first of the year he and the victim went to Mexico and other Central American countries. They returned to the U.S. in March '83 and went to Bakersfield, California. In Bakersfield, California Felix Vail and the victim were married by Judge Jack E. Lund on August 15, 1983. From that point it was unclear as to where Felix Vail stayed with Mary Craver at that time.

. . . .

From that point it is unclear as to where Felix Vail and the victim lived. Vail advises that they did come to Tulsa, December '83, and they did stay with Mary Carver at that time. It is also unknown as to where Felix Vail and the victim lived after leaving Tulsa after their two-week stay in December of '83. Felix Vail does not advise that he and the victim separated in April of '84, and the victim came back to Tulsa where she lived with her mother at the 1540 East 16th Street address. In June 1984 Felix Vail came to Tulsa and took up residence with the victim at the above-mentioned address. There they lived until the victim and Felix Vail supposedly parted ways in September 1984. Felix Vail advised during the summer of '84 while living in Tulsa the victim became dissatisfied with their marriage. Felix Vail states that he knew she was getting ready to leave him. Felix Vail blamed the victim's mother, Mary Craver, for the victim leaving him. Vail advised the victim wanted to get out on her own away from him and her mother so she could find herself. Felix Vail states the victim was trying to decide whether or not to adopt a lifestyle like her mother's, (heavy in casual sex) or to remain faithful to Felix Vail. Felix Vail advised on 9/13/84, Thursday, he and the victim left the 1540 East 16th Street address between 1200 and 1500 hours to go on vacation. Vail advises when they left they had no specific destination planned. So they left traveling in a northeasterly direction. Felix Vail advises on 9/13/84 the day they left, he and she spent the night in a Claremore hotel. Felix Vail could not give the name of the hotel but did say it was one of the older, taller buildings in downtown Claremore. The next day 9/14/84 Vail advises they traveled into Missouri. Vail could not name the highways they traveled. Reporting officer believes they may have traveled U.S. 66 Highway. Felix Vail advises they camped out beside some river the night of 9/15/84. On Saturday 9/15/84 Vail states they continued in a northeasterly direction towards St. Louis, Missouri. That night they again camped out. On 9/16/84 Vail advises they arrived in St. Louis, Missouri. Vail further advises that by that time the victim had decided to leave Felix Vail, to leave him and to strike out on her own. Felix Vail advises they looked in a phone book

24

and ascertained the location of a Trailways Bus station. They then proceeded to the bus station where Felix Vail dropped the victim off between 1300 and 1400 hours. Vail did not know the location of the bus station in St. Louis. Felix Vail did no go into the station with the victim so he advises he did not know if the victim bought a ticket or not. The victim had advised Vail that she intended to take a bus to Denver, Colorado where she intended to obtain a false ID. Felix Vail left the bus station without knowing that the victim did take a bus to Denver. After dropping the victim off at the station in St. Louis Vail advises he drove home. It is not known if Vail stopped anywhere along the way. The victim and Vail did all their traveling in a 1979 blue Fiat Spider.

. . . .

Vail advises when he dropped the victim off at the bus station in St. Louis she was wearing an orange t-shirt, gray sweat pant bottoms and slippers. The victim was carrying a large navy blue canvas backpack, a brown cloth handbag and a sleeping bag. Vail believes she was carrying $50,000 in cash, although, he did not see the money. Vail assumes that she had that much money because after returning home he found only $10,000 left in the house. Vail believes there was approximately $60,000 in the house before they left on 9/13/84. Vail states the money was in denominations of $100 dollar bills. Felix Vail also advised that before the victim left she deeded the property at 1540 East 16th Street to him. Vail provided reporting officer with a copy of the deed. In describing the victim, Felix Vail advises she was schizoid and sometimes suicidal. Vail states her mental condition was caused by her mother. Vail also advises the victim was bisexual and many times engaged in casual sex with men. Vail states the victim seldom used drugs or alcohol and was somewhat musically-inclined. In reference to the large amount of money the victim was in possession of Vail states she received the money when she turned 18. The victim was the beneficiary of an insurance policy owned by her father, Gary Craver. Vail advises Gary Craver died before he met the victim. When the victim turned 18 Vail advised she received $100,000 from the policy. The victim received the money in the form of a cashier's check from a large bank in San Antonio, Texas. Vail advises he was with the victim when she accepted the check. Vail states the victim upon receiving the large check had it broken down into smaller Traveler's Checques. Vail states they never deposited the checks in any accounts. While in Tulsa Vail states the only account he and the victim had was a checking account at Pioneer Savings located at about 17th Street and Utica. Vail did not advise in whose name the account was in.

. . . .

On that date Vail also gave reporting officer a copy of a letter he had just sent to Mary Craver.

25

The detective testified that he spoke with several family members and friends who were at times involved in Ms. Carver's life, including her lawyers, before and after she met and married the defendant. No one had heard from her or had any knowledge of where she might have gone. He noted that after she met the defendant, her relationships with others deteriorated.

Lori Viscer, a detective with the Tulsa City Police Department became involved with the missing person case of Annette Carver in 1994. She stated that she spoke with the defendant in July 1994, and he told her that he had spoken with Annette Carver in March 1985 and later in the fall. She stated that when she spoke with the defendant again, he told her that Annette Carver had two children. Ms. Viscer noted the fact that Annette Carver had allegedly communicated with the defendant in 1985 was never reported by him to the police. She further stated that the defendant was adamant that he had dropped Annette Carver off at the Trailways Bus station on September 16, 1984. However, the detective testified that in 1984 the defendant reported to a different detective that he and Annette Carver had gone to the Cal-Cam fair before he took her to the bus station. The Cal-Cam fair was in October of that year, a month after he claimed to have taken her to the bus station and had not seen her since.

Joe Campbell, a detective with the Tulsa Police Department, testified that in 2013, he was contacted by a couple who had recently purchased the defendant's house in Tulsa. The couple had rented the house prior to purchasing it. During the rental period, there was one room in the attic that remained locked. After they purchased the house, they entered the room after the defendant had removed the contents and discovered a blue bag tucked underneath the overhang of the roof. Because they were aware of the disappearance of the defendant's wife, Annette Carver, they turned the bag over to the detective. Inside were several items

26

determined to belong to Annette Carver. In the bag were clothing: skirts, shirts, underwear, and hats. Also in the bag were various feminine hygiene products and two packages of birth control pills, one package unopened. The birth control pills were prescribed to Annette Carver.

Vicky Lyons, the defendant's niece, lived in Sulphur, Louisiana. She testified that she last saw Annette Carver in October 1984 when the defendant and Annette Carver visited. She stated that they went to the Cal-Cam fair. Although Ms. Lyons saw the defendant a few weeks later, she never saw Annette Carver again. Ms. Lyons also stated that she never saw the defendant treat Annette Carver badly. The fair started on October 8, 1984.

Mary Carver,[4] mother of Annette Carver, testified that she has not heard from her daughter in thirty-two years. She believes Annette is dead. Ms. Carver met the defendant in 1981 when her daughter was fifteen years old. She stated that up until that time, she and her daughter had a good relationship. Ms. Carver said that her daughter was in a private high school and graduated when she was sixteen. Her daughter came home to Tulsa after school, and the defendant showed up about a month later. He invited Annette to go on a motorcycle trip with him.

Ms. Carver testified that when her daughter was around thirteen, her father died in a car accident. He left two life insurance policies to Annette in the total amount of one hundred thousand dollars. The money was put into a trust for Annette until she turned eighteen, with Ms. Carver as executor. She testified that Annette and the defendant married a little before Annette turned eighteen. Ms. Carver said she had at first refused to give her permission for Annette to marry, but Annette said she would run away to Mexico with the defendant and marry him

---

[4]Ms. Carver took the last name "Rose" several years prior to trial. She was alternatively referred to as Mary Rose in the trial record.

27

there. Ms. Carver also stated that prior to Annette getting married, she and Annette purchased a house in Tulsa in 1982 together. Ms. Carver said that Annette liked Tulsa, and Ms. Carver thought it would be a good investment for Annette.

Ms. Carver testified that in May 1984, Annette returned home. She announced that she was going to divorce the defendant and start college. However, the defendant showed up six weeks later. Ms. Carver stated that under duress, she deeded her interest in the house to her daughter. She was not aware until a few months later that Annette deeded the house to the defendant as his sole property. Annette told her mother that the money she received from her father's insurance was in a briefcase because neither she nor the defendant believed in banks. After this, Ms. Carver had very little communication with her daughter. She stated that eventually a friend called her and told her that the couple left Tulsa, and while the defendant returned, Annette did not. Ms. Carver called the defendant. He told her that Annette wanted to go to Mexico and that he put her on a bus in Missouri. She stated that the defendant then resisted any attempt thereafter to answer her questions or to talk to her about where Annette went. Ms. Carver went to the property she and Annette had originally owned. The defendant was living in a cottage on the property behind the main house which was rented out at the time. The defendant was not home. Ms. Carver said she broke into the house. Ms. Carver testified that while Annette did not have a driver's license, she did have a passport. However, Ms. Carver found the passport's picture of her daughter, apparently torn out of the passport. She also found a handwritten document indicating that there was forty-one thousand dollars in a bank account in Louisiana. The document was in Annette's handwriting. The document also indicated that Annette gave the defendant ten thousand dollars to pay a debt.

28

Finally, Ms. Carver identified a copy of the letter the defendant sent to Sharon Hensley's mother after Sharon Hensley had disappeared. Ms. Carver explained that she had gone to Mississippi to see the defendant's family in an attempt to get information about her daughter. At this time, Ms. Carver learned of Sharon Hensley's disappearance. She then contacted Sharon Hensley's family and was given the letter the defendant had sent to Sharon Hensley's mother. Finally, Ms. Carver testified that much later, she heard an interview on the radio with Jerry Mitchell, who was investigating a civil rights murder cold case. She contacted Mr. Mitchell, and about a year later, he took up the investigation into the disappearance of the two women. The state's final witness was Michael Baden, a medical doctor, forensic pathologist, and medical examiner. He testified that in his opinion, Mary Vail died of traumatic asphyxia in a manner which he categorized as a homicide. Dr. Baden was qualified as an expert in forensic pathology after his extensive history in forensics was discussed. Among other notable achievements, he was a medical examiner in New York City for years wherein he gained extensive experience in examining and determining the cause and manner of death of persons who were killed prior to being dumped into the water and persons who actually drowned.

Dr. Baden described Mary Vail's death as being caused by strangulation, suffocation, or both. Dr. Baden discussed the scarf that was wrapped around the victim's neck and noted that the end of the scarf was in her mouth to a depth of four inches. Referring to the testimony of the defendant's expert who dispelled the theory of strangulation because there were no ligature marks described in the original autopsy report, Dr. Baden explained that because the scarf was a wide ligature rather than like a rope or a wire, the scarf would have produced a wider compression around the neck, thus leaving no marks. He compared the scarf's act

of compression to a "carotid sleeper hold" used at times by the police to subdue a suspect's resistance "where they put the forearm around the neck to compress the arteries on the side. The crook of the arm would be pointing outward and there'd be pressure on either side of the neck and prevents blood from going to the - - to the brain - - so a person could pass out and they could be handcuffed." Marks were not generally left on the neck in the case of a carotid sleeper hold. He did note that in the pictures of Mary Vail's body there did appear to be some swelling about the ligature, which indicated pressure. The doctor further stated that the cloth in Mary Vail's mouth was sufficient to cause suffocation, suggesting perhaps that she passed out and then was unable to breathe because of the blockage in the back of her throat.

While Dr. Cook's autopsy report stated that the scarf was loose around Mary Vail's neck, Dr. Baden testified that after the body was out of the water, it began to dry out, as did the cloth. Referring to what appeared to be a knot in the scarf in the photographs of Mary Vail's body, he stated;

> [A]s people pick up the body from the stretcher and put it on another stretcher and bring it into the morgue, there is a lot of handling of the body. It's very easy for evidence to get - - to change. Such as the knot loosens and Dr. Cook doesn't see a knot.
>
> But in my opinion that's why the scene photos are always very important to a forensic pathologist because you can see what the body looked like before it goes in the body bag and goes to the morgue which can change a lot of things while jostling around in the body bag being moved around, etcetera.

Dr. Baden also explained the difference between lividity, the pooling of blood on the down side of the body, and cyanosis, which is caused by the lack of oxygen in the skin. He believed that the dark discolored areas of Mary Vail's face was cyanosis, but it was not found below the ligature, which, in his opinion, supported the conclusion of strangulation. Dr. Baden agreed with Dr. Traylor, the

defendant's expert, that determining a drowning as the cause of death was more of a matter of excluding other causes of death. Dr. Baden also noted that Mary Vail had a substantial hematoma on the back side of her head which was caused by a blunt force impact which he said certainly could have knocked her unconscious. If Mary Vail was unconscious when the scarf was wrapped tight around her neck and stuffed inside her mouth, she would have suffocated. The doctor reasoned this could explain the absence of scratch marks on the neck as could often be seen from persons attempting to extricate themselves from a thin ligature or manual strangulation.

Finally, the doctor testified that a common sign of drowning was "frothing," which was not present in Mary Vail's case. He explained that "by breathing in water and air, one gets a froth, a frothy fluid in the air passages[.]" "[It]s like when you mix fluid, you get bubbles, air and water. . . . If we breathe water into our lungs we're breathing water and saliva mixed with air." Furthermore, the doctor testified that, although in Doctor Cook's autopsy report it was stated the lungs were heavy, there was no evidence of significant water in the lungs and that lungs would be heavy in a body that had been in the water. He agreed they would be heavier in an individual who drowned.

James Traylor, Jr., a medical doctor specializing in forensic pathology, testified on behalf of the defendant and opined that the evidence supports a conclusion of accidental drowning. Dr. Traylor primarily took umbrage with Dr. Welke's one hundred percent certainty that the manner of Mary Vail's death was homicide. Dr. Traylor agreed generally with Dr. Welke regarding the decomposition process of a body under various conditions. However, Dr. Traylor testified that from the time Mary Vail was reported to have fallen into the water until the time the body was

31

recovered and shortly thereafter autopsied, in his opinion Mary Vail's body would have been past the stage of rigor mortis. He noted that the "stiffness" of the body cannot be determined by only two pictures and the testimony of one person with no medical knowledge. Furthermore, Dr. Traylor stated that the lividity noted in the autopsy report and visible in the photographs indicated Mary Vail was face down in the water. However, the doctor agreed that most drowning victims surface face down in the floating position. Dr. Traylor testified that the best diagnosis for a drowning was a reliable eye witness. He further stated that a diagnosis of drowning was a diagnosis of exclusion of other causes of death. The doctor noted that there was nothing significant in the autopsy report with respect to a cause of death. He discussed the possibility of strangulation, suffocation, or being killed by a blow to the head. Regarding strangulation, the doctor testified most of the strangulation victims he has examined had gouge marks on the throat from the victim attempting to free themselves from the ligature. Furthermore, he agreed a blow to the backside of Mary Vail's head could render her unconscious. However, he concluded there was no evidence indicating conclusively any of the above potential causes of death occurred. Therefore, by exclusion, Mary Vail must have drowned.

In summary, the jury heard extensive testimony from three expert witnesses regarding whether Mary Horton Vail was dead before she entered the water or died after she entered the water. The experts also offered opinion testimony as to the events surrounding her death, based on the reports and evidence available to them as well as their opinions pertaining to the cause of death. Two of the experts concluded the manner of Mary Horton Vail's death was a homicide. One testified that he concluded the death was an accidental drowning. The jury heard the testimony of all three experts in great detail, viewed the photographs, and read the

autopsy report. Faced with conflicting expert opinions, the jury was entitled to accept whichever one, in their opinion, better explained the facts of the incident. La.Code Evid. art. 702. An appellate court should "not disturb the jury's choice to accept one expert's opinion unless that opinion is patently unsound." *State v. Ellis,* 28,282, p. 5 (La.App. 2 Cir. 6/26/96), 677 So.2d 617, 623, *writ denied*, 96-1991 (La. 2/21/97), 688 So.2d 521. After reviewing the experts' testimony in their entirety, we do not find the expert witnesses' opinions of the cause and manner of death to be patently unsound.

In great part, most of the witnesses in this case presented evidence that was circumstantial in nature. This evidence consisted of contradictory statements made by the defendant, information from officers and investigators regarding the disappearance of two other women connected to the defendant, information regarding life insurance policies, testimony regarding fear of 'dark water' and the likelihood of her voluntarily getting into a boat on the river at night, the physical findings at the scene that contradicted the defendant's statement that his wife accidentally fell into the river, and testimony regarding the relationship between the defendant and the victim at the time of her death.

The testimony of three of the state's witnesses, however, is not circumstantial in nature. Wesley Turnage, Robert Fremont, and Bruce Biedebach all testified regarding statements the defendant made to each of them at different times wherein he stated to them that he killed his wife.

Wesley Turnage testified that after Mary Horton Vail's death, while riding to work with the defendant one day, the defendant stated "I didn't want the youngin' I got, and I didn't want another one, and fixed that damned bitch. She won't never have another kid."

Robert Fremont testified that, as a teenager, he met the defendant in California. He stated that on two separate occasions, the defendant told him that he killed his wife. On the second occasion, he testified that the defendant talked about hitting his wife in the head with an ore and some talk regarding a boat, a disagreement, and then the defendant feeling justified in taking her life.

Bruce Biedebach, who also met the defendant in California, also testified that the defendant, on more than one occasion stated he killed his wife. Mr. Biedebach was told it was ruled an accidental drowning, so he believed perhaps the defendant felt guilty because he failed to save her.

We find these admissions by the defendant, taken together, are confessions and therefore are direct evidence that he committed the offense. *See State v. Richardson*, 16-107 (La.App. 3 Cir. 12/28/16), 210 So.2d 340.

In the current case, the jury obviously concluded the three witnesses to whom the defendant stated he killed his wife were worthy of being believed. The jury seemingly believed Dr. Welke's conclusion that Mary Vail was dead when she went into the river late that evening or Dr. Baden's theory that she may have died in the water as a result of foul play. They heard testimony that she was fearful of being in "dark water" and never went out in the defendant's boat during the daytime, yet she allegedly went fishing with the defendant after dark. The jury also had the opportunity to peruse the Calcasieu Parish Sheriff's Office investigation report compiled in 1962 describing the direction of the investigation and the concerns being addressed to determine what happened to Mary Vail. While the report did not offer any conclusions or explanations, it did reflect the defendant's attitudes and behavior at the time of Mary Vail's death.

The jury heard testimony of the mysterious and suspicious disappearance of two other significant women in his life, and the defendant's apparent attempt to

dissuade their families from searching for the women by stating that they were fleeing from their overbearing mothers and did not want to be found by anyone. In each case, Mary Vail, Sharon Hensley, and Annette Carver, the defendant was the last person to see each of the women alive.

Moreover, whatever was the cause of Mary Vail's death, strangulation, suffocation, or a blow to the head, the fact that the defendant attempted to cover up the offense by trying to convince the police that she accidently fell overboard was sufficient evidence for the jury to conclude he had specific intent to kill her. "[S]pecific intent is a state of mind, and need not be proven as a fact, but may be inferred from the facts and circumstances of the transaction and the actions of the defendant." *State v. Boyer,* 406 So.2d 143, 150 (La.1981). "Specific intent is an ultimate legal conclusion to be resolved by the fact finders." *State v. Graham,* 420 So.2d 1126, 1128 (La.1982).

The evidence, in this matter both direct and circumstantial, the testimonies, documents, and the defendant's statements, viewed in a light most favorable to the prosecution, contained enough information to exclude the defendant's assertion of innocence and supports the jury's finding that the defendant killed his wife, Mary Vail.

**ASSIGNMENT OF ERROR NUMBER TWO**

The defendant argues it was error for the trial court to allow the introduction of evidence regarding the disappearance of Sharon Hensley and Annette Carver Vail. He calls the evidence a probability wrapped in a presumption and multiplied by speculation. He argues that allowing the state to imply that the two other women are dead effectively secured the conviction. He argues the burden was impermissibly shifted to him to prove his innocence rather than the state having to prove his guilt. He argues that the state was able to secure the trial court's

approval of the state's use of other acts by determining the probability of Sharon Hensley's and Annette Carver's deaths via Louisiana Civil Code Articles 30 and 54, which establishes the presumption of death of persons gone missing under certain circumstances. The defendant argues that it was necessary for the state to establish a presumption of death when there was absolutely no evidence of their death in order to invoke the Doctrine of Chance argument and thus allowed the trial court to circumvent the prohibition of admission of other acts pursuant to La.Code Evid. art. 404(B).

This issue has been previously brought before this court on a pre-trial writ. *State v. Vail*, 14-436 (La.App. 3 Cir. 11/5/14), 150 So.3d 576, *writ denied*, 14-2553 (La. 8/28/15), 176 So.3d 401. The panel of this court that issued the above ruling found the evidence to be admissible. The Louisiana Supreme Court in *State v. Humphrey*, 412 So.2d 507, 523 (1981), held:

> When this court considers questions of admissibility of evidence in advance of trial by granting a pretrial application for supervisory writs (rather than deferring judgment until an appeal in the event of conviction), the determination of admissibility does not absolutely preclude a different decision on appeal, at which time the issues may have been more clearly framed by the evidence adduced at trial. Nevertheless, judicial efficiency demands that this court accord great deference to its pretrial decisions on admissibility, unless it is apparent, in light of the subsequent trial record, that the determination was patently erroneous and produced an unjust result.

We have reviewed the pretrial writ record and find that the defendant makes no new argument that was not presented to this court pretrial. The issue was thoroughly reviewed by the writ panel. The defendant, in brief, does not argue where in the trial record that is now before this court there is any evidence that would indicate the pretrial ruling was patently erroneous and produced an unjust result. We find no palpable error in the ruling of the writ panel. Accordingly, we

find the law of the case doctrine applies. This assignment of error is without merit.

## ASSIGNMENT OF ERROR NUMBER THREE

In his third assignment of error, the defendant argues that the trial court did not adequately instruct the jury as to the burden of proof required when another "act" could be considered by the jury pursuant to La.Code Evid. art. 404(B).

Initially, we note that following closing arguments, after the trial court read the instructions to the jury and the jury retired to deliberate, the trial court asked if there were any objections to the instructions.

> **THE COURT:** Mr. Holland and Mr. Hall [prosecutors], any objections to the charges as read to the jury?
>
> **MR. HALL:** No, sir.
>
> **THE COURT:** Mr. Casanave, any objections to the charges as read to the jury?
>
> **MR. CASANAVE:** Your Honor, the Court has jury instructions that we had proposed. We ask that it be filed in the record. We would have preferred those over the alternatives that were given.
>
> **THE COURT:** They're already in the record. The Court has met with the attorneys, considered those. I am not changing what I have read to the jury. Those objections are so noted for the record.
>
> **MR. CASANAVE:** Thank you, Your Honor.

Having reviewed the record in its entirety, we do not find the defendant's proposed jury instructions. The defendant, in brief, does not reference where in the record the proposed instructions can be located. While the defendant's argument in his brief pertains to instructions that were requested by the state, Mr. Casanave did not state for the record which instructions he was referring to or the basis for his objections. The state filed "Special Requested Jury Instructions" on July 15, 2016. On July 18, 2016, the state filed "Amended Special Requested Jury Instructions." On August 11, 2016, the state filed "State's Opposition to the

defendant's Special Requested Jury Instructions." The opposition brief discussed the defendant's argument on spoliation of evidence and a civil charge on transfer of property. The opposition brief noted that the charges would have also required explanation and qualification, which are prohibited by La.Code Crim.P. art. 802. Otherwise, the opposition brief does not illuminate what special jury charges the defendant requested.

Louisiana Code of Criminal Procedure Article 807 provides:

> The state and the defendant shall have the right before argument to submit to the court special written charges for the jury. Such charges may be received by the court in its discretion after argument has begun. The party submitting the charges shall furnish a copy of the charges to the other party when the charges are submitted to the court.

> A requested special charge shall be given by the court if it does not require qualification, limitation, or explanation, and if it is wholly correct and pertinent. It need not be given if it is included in the general charge or in another special charge to be given.

Additionally, Louisiana Code of Criminal Procedure Article 801(C) provides:

> A party may not assign as error the giving or failure to give a jury charge or any portion thereof unless an objection thereto is made before the jury retires or within such time as the court may reasonably cure the alleged error. The nature of the objection and grounds therefor shall be stated at the time of the objection. The court shall give the party an opportunity to make the objection out of the presence of the jury.

In *State v. Law,* 12-1024 (La.App. 3 Cir. 4/3/13), 110 So.3d 1271, *writ denied,* 13-978 (La. 11/22/13), 126 So.3d 475, this court held that failure to make a contemporaneous objection to a jury instruction cannot be considered on appeal. There is an exception to this rule. In *State v. Paul*, 05-612, pp. 14-15 (La.App. 3 Cir. 2/14/06), 924 So.2d 345, 354 (footnote omitted), this court discussed whether a jury instruction could constitute reversible error regardless of whether there is an objection to the instruction by the defendant:

38

However, an exception to the above rule is when the error is in the definition of the crime and where the error bears full and sufficient proof of the error without the necessity for further hearing. *State v. Hollins*, 99-278 (La.App. 5 Cir. 8/31/99), 742 So.2d 671, 682, *writ denied,* 99-2853 (La.1/5/01), 778 So.2d 587. The Louisiana Supreme Court reversed a defendant's conviction in *State v. Williamson,* 389 So.2d 1328 (La.1980), despite the lack of objection to the jury charges, because the jury was improperly charged with the wrong definition of the charged crime. In *Williamson*, the Court found that it is within the province of the reviewing court to entertain complaints of constitutional violations, notwithstanding that consideration of such complaint, more often than not, is deferred until the filing of a writ of habeas corpus, whether they are objected to at trial or raised on appeal. *Williamson,* 389 So.2d at 1331; *State v. Armant,* 97-1256 (La.App. 5 Cir. 5/27/98), 719 So.2d 510, 516, *writs denied*, 98-1884 (La.11), 729 So.2d 3; 98-1909 (La.11/20/98), 729 So.2d 4; 01-1042 (La.1/4/02), 805 So.2d 1184. When the asserted error involves the very definition of a crime, it is of such importance and significance as to violate fundamental requirements of due process. *Id.*

The defendant failed to make a contemporaneous objection on the record to the proposed charge. We do not find that the instruction falls under an exception to the contemporaneous objection rule as set forth in *Paul.* Accordingly, we find this assignment of error was not preserved for appeal.

## ASSIGNMENT OF ERROR NUMBER FOUR

In this assignment of error the defendant argues that he was convicted by "deposition." He contends that two of the state's witnesses whose testimony was presented via video-taped examination were available for trial. Therefore, he did not have the guaranteed "right to fully cross-examine adverse witnesses. U.S. Const. amend. VI, La. Const. art. I, § 16."

The Sixth Amendment to the United States Constitution guarantees an accused in a criminal prosecution the right to be confronted with the witnesses against him. The confrontation clause of the Louisiana Constitution expressly guarantees the accused the right "to confront and cross-examine the witnesses against him." La. Const. art. I, § 16; *State v. Robinson*, 01-0273 (La.5/17/02), 817 So.2d 1131, 1135. Confrontation means more than the ability to confront the witnesses physically. Its main and essential purpose is to secure for the opponent the opportunity of cross-examination. *Id.* Cross-examination is the primary means by which to test the believability and truthfulness of testimony and has traditionally been used to

impeach or discredit witnesses. *Id.*; *State v. Williams,* 04-608 (La.App. 5 Cir. 11/30/04), 889 So.2d 1093, 1100, *writ denied,* 05-0081 (La.4/22/05), 899 So.2d 559.

*State v. Lewis*, 05-170, pp. 12-13 (La.App. 5 Cir. 11/29/05), 917 So.2d 583, 592, *writ denied*, 06-757 (La. 12/15/06), 944 So.2d 1277.

The witnesses, Robert Fremont and Bruce Biedebach, lived in California and testified via video-taped examination that the defendant told them he had killed his wife, Mary Vail. The state moved to perpetuate their testimonies after establishing that they would be unavailable for trial, which was scheduled to commence on August 8, 2016. The video-taped testimonies were taken in Lake Charles, Louisiana.

In *State v. Ball*, 00-2277, pp. 25-6 (La. 1/25/02), 824 So.2d 1089, 1111-1112, *cert. denied,* 537 U.S. 864, 123 S.Ct. 260 (2002), the supreme court discussed the requirements necessary to admit prior testimony of an unavailable witness:

> La.Code Evid. art. 804(B)(1) provides, as does its federal counterpart, Fed. R.Evid. 804(b)(1), an exception to the hearsay rule for testimony given by an unavailable declarant as a witness in another hearing of the same or a different proceeding, "if the party against whom the testimony is now offered . . . had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination." La.Code Evid. art. 804(B)(1) incorporates a firmly-rooted exception to the hearsay rule. *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980); *Mattox v. United States*, 156 U.S. 237, 15 S.Ct. 337, 39 L.Ed. 409 (1895).
>
> Determining the unavailability of a witness is a preliminary question for the court. La.Code Evid. art. 104(A). Such determinations are reviewed for manifest error, and will not be overturned, absent an abuse of the trial court's discretion. This Court has held that use of the prior testimony must not impinge on the defendant's constitutional right to confront and cross-examine adverse witnesses, as guaranteed by the Sixth Amendment of the United States Constitution, Art. I, § 16 of the Louisiana Constitution, and La.Rev.Stat. § 15:273. *State v. Hills,* 379 So.2d 740, 743-44 (La.1980); *see also State v. Pearson,* 336 So.2d 833, 835 (La.1976); *State v. Ghoram,* 328 So.2d 91, 93-94 (La.1976). To protect these constitutional rights, certain conditions must be met before the prior testimony may be introduced: (1) the

defendant must have been represented by counsel at the earlier hearing; (2) the witness must have testified under oath; (3) the witness must have been cross-examined (or there must have been a valid waiver of the right to cross-examination); (4) at the time of trial, the witness must be "unavailable" to testify; and (5) the State must have made a good faith effort to locate the unavailable witness. *Hills,* 379 So.2d at 743-44. These jurisprudential criteria are subsumed in La.Code Evid. art. 804(B)(1), permitting the use of prior recorded testimony of an unavailable declarant as an exception to the hearsay rule.

On March 16, 2016, at a motion to recuse hearing, the state informed the trial court that it had just learned Mr. Biedebach was scheduled to be out of the country during the time trial was scheduled. Accordingly, the state desired to perpetuate his testimony for trial purposes. The trial court set a date of May 31, 2016, to conduct the video examination of Mr. Biedebach. The defendant did not object prior to or when the testimony was taken.

On July 29, 2016, shortly before trial commenced, at a motion hearing, the state reminded the trial court that Mr. Biedebach had scheduled a several-week trip to Europe to visit with a daughter he had never met. The defendant objected to the trial court permitting the perpetuated testimony of Mr. Biedebach to be admitted at trial, although the reason for taking the video examination was known to the defense at the time it was taken. The trial court required the District Attorney's Office to supply proof the witness was out of the country. The state advised the trial court it would provide documentation or testimony to establish Mr. Biedebach's unavailability. At that point, the trial court then stated that Mr. Biedebach's video-tape testimony would be allowed at trial.

The state provided the trial court with the requested information regarding Mr. Biedebach's trip to Europe, which he booked in January 2016. In an affidavit prepared by the state's investigator, it was noted that Mr. Biedebach booked flights for himself and two traveling companions to Frankfurter, Germany, leaving on

August 1, 2016, and returning on August 23, 2016. The August 8, 2016 trial was scheduled on February 24, 2016.

However, at trial, prior to the state showing the jury the video of Mr. Biedebach's testimony, the defendant made the following argument:

> **MR. MONROE:** [Defense counsel] Judge, Mr. Holland stated that the Court had already ruled that the perpetuated testimony of the three individuals they intend to show have already been admitted, we would - - at this time we would object to the testimony of Mr. Biedebach being used in the perpetuation since the proof that was submitted to this Court specified in particular that he had plans to be out of the country.
>
> His itinerary specifically stated his flight did not leave for 16 days following the 4th of - - or the 8th of August. And 16 days from the 8th until the time in which his flight departed, so we're certainly objecting to his being considered unavailable.
>
> **MR. HOLLAND:** Judge, I don't recall that being the information. He left the country a couple of weeks ago, and he won't be back for a couple of weeks.
>
> I think that's the information the Court has. I don't know where counsel got that information.
>
> **THE COURT:** Well, let me say this. That's how I interpreted the information that was submitted to me.
>
> **MR. HOLLAND:** Right.
>
> **THE COURT:** If you're telling me that's incorrect, Mr. Monroe, then I apologize.
>
> But I'd already indicated that I was going to accept what had been presented to the Court as to the unavailability of Mr. Biedebach.

Mr. Beidebach's video examination was given on May 21, 2016. The defendant argues the state made no attempt to dissuade Mr. Biedebach from taking the trip to Europe at the time of trial or attempted to continue trial. The jury was able to observe Mr. Biedebach's demeanor and hear his testimony, both direct and cross-examination, in his own words. Further, defense counsel raised no objection to perpetuating his testimony or the admission of that testimony at the

time the court issued its ruling or at the time it was taken. We find no abuse by the trial court in the admission of his testimony by video.

On July 7, 2016, Mr. Fremont's video examination was taken for the purpose of perpetuating testimony. Prior to the commencement of the witness's testimony, the trial court noted for the record:

> Let me make a statement for the record here. I was contacted a week or so ago by their attorneys, Mr. Holland's office, indicating that he felt the need to preserve testimony of another out-of-state witness. We had some discussions regarding that matter. Mr. Casanave indicated he would object at that time, and I will certainly give Mr. Casanave an opportunity to address the record also.

> I indicated to Mr. Holland and Mr. Casanave that I would schedule the opportunity for the District Attorney's Office to preserve the testimony of the witness that I believe Mr. Holland wishes to put on the stand today.

> But I did indicate that based on what I had heard I was asking the District Attorney's Office to provide additional information regarding the suggested unavailability or issues with the testimony of that particular witness. I indicated to Mr. Holland that I wanted something in writing and I wanted something presented to the court.

> In the interim before today Mr. Holland has provided through emails, that I'm going to file into the record here. The information that he has received from Mr. Robert Fremont, F-r-e-m-o-n-t, indicating the difficulty that he would have in being here on August 8th, which is the proposed, we believe is the date that we plan to commence the trial in this matter.

> As I indicated to Mr. Casanave before the court hearing started this morning, that based on what I had requested from Mr. Holland and based on what has been presented to the Court thus far, that I am going to allow Mr. Holland to put Mr. Fremont's testimony in at this time.

Mr. Fremont had been subpoenaed to attend trial on August 10th-12th. The information the trial court referred to was an email from Mr. Fremont explaining in detail why he would find it very difficult to come to Lake Charles to attend a trial commencing August 8, 2016, and an employment contract. In the email Mr. Fremont explained that he owned a carnival concession. He explained that he has

contracted with the District Agricultural Association in Orange County, California, for the dates July 15th through August 15, 2016. He stated that eighty percent of his yearly income was derived during this employment period. He was a sole owner and ran the concession himself. He stated that he has a "very labor intensive booth there in Orange County and plan[ed] to start [the] set up there on the 9th of August as it is a big booth and takes about a week to build."

The defendant argues in brief that the trial court erred when it granted the state's request which was based solely on the assertion that it was "inconvenient" for the witnesses to come to Louisiana from California to testify at trial. At the hearing, the defendant argued that if Mr. Fremont's testimony was video-taped, he would not be able to recall the witness if the need arose. He argued the jury was entitled to actually see him testify. The defendant asserted that "this Court has seen brain surgeons; . . . engineers; other Courts have seen astronauts. Why is this man who provides some services to carnivals more urgent than those people?" The defendant further noted that he had been informed that Mr. Fremont had a criminal record, but the state had not provided him with a copy of the record "which I'm entitled to before he testifies. Therefore, unless it's provided, we're not ready to proceed." The trial court granted the state's request to proceed with the video examination. The defendant objected to the ruling.

Arguing that perpetuation of testimony should only be permitted when it was necessary, like when a witness was elderly or sick and might die before trial, the defendant states that the requirements for establishing "unavailability" set out in La.Code Evid. art. 804(B)(1), permit the use of prior recorded testimony of an unavailable declarant as an exception to the hearsay rule. Therefore, he asserts that the trial court created a "self-fulfilling prophecy that the witnesses' testimony would meet the requirements of L.C.E.art. 804[.]" However, in *Ball*, 824 So.2d

1089, the supreme court stated that the jurisprudential criteria for determining unavailability for the purpose of perpetuation of testimony of a witness was subsumed in La.Code Evid. art. 804(B)(1).

In brief, the defendant argues that Mr. Fremont flew to Lake Charles on July 7, 2017, to do the video examination. Accordingly, Mr. Fremont could have taken August 10th-12th off from work to fly into Lake Charles for the trial.

The testimony of two men was relevant and significant to the state's case, and it was necessary for the state to preserve their testimony. The statements about which he testified were direct evidence of the defendant's guilt.

In the current case, Mr. Fremont was represented by counsel for the purpose of the examination. The deposition was a video examination. The defendant was present. Mr. Fremont testified in court, under oath, and was cross-examined by defense counsel. Mr. Fremont was not available for trial due to the demands of his employment. However, the jury had the opportunity to observe his demeanor and his testimony in his own words. Defense counsel had advance notice that Mr. Fremont would be testifying and the substance of his testimony. Defense counsel inferred Mr. Fremont could be present because he was just a carnival worker. While doctors and engineers who are required to leave their employment for a day or two to testify at trial are generally paid year around, and usually paid to testify as an expert, eighty percent of Mr. Fremont's yearly income comes from that one fair. Finally, Mr. Fremont willingly came to Lake Charles to testify shortly before trial. In the case of Mr. Fremont, the defendant's constitutional right to confront and cross-examine the witnesses against him was not violated. The trial court did not abuse its vast discretion when it granted the state's request to take a video examination to perpetuate Mr. Fremont's testimony and present it to the jury.

45

We find no manifest error in the trial court's ruling. The trial court did not abuse its considerable discretion when it allowed Mr. Fremont's and Mr. Biedebach's testimony to be preserved for trial purposes. There is no merit to this assignment of error.

## ASSIGNMENT OF ERROR NUMBER FIVE

In this assignment of error the defendant asserts the trial court erred in denying the defense's motion to suppress the evidence of Gina Frenzel on grounds the motion was untimely – not on the merits – when the defense argues they established "good cause" for the late filing.

Prior to Ms. Frenzel's testimony, defense counsel made an oral motion to suppress. The defendant asserted that Ms. Frenzel entered the defendant's home on false pretenses and without a warrant. He argued that because she was coordinating with the sheriff's office and turned items submitted into evidence immediately over to the District Attorney's Office, she was essentially an agent of the state; therefore, she conducted an illegal search and seizure, and the items must be suppressed.

The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Similarly, the Louisiana Constitution provides that "[e]very person shall be secure in his person, property, communications, houses, papers, and effects against unreasonable searches, seizures, or invasions of privacy." La. Const. art. 1, § 5. As a general rule, searches and seizures must be conducted pursuant to a validly executed search warrant or arrest warrant. Warrantless searches and seizures are considered to be per se unreasonable unless they can be justified by one of the Fourth Amendment's warrant exceptions. *State v. Freeman,* 97-1115 (La.App. 5 Cir. 12/29/98), 727

46

So.2d 630. The state has the burden of showing that one of the exceptions applies. *Id.*

Prior to Ms. Frenzel's testimony, the trial court received a "blank copy of a Motion to Suppress." The defendant informed the trial court that he desired to suppress evidence but was not exactly clear on what he desired to suppress, Ms. Frenzel's testimony, the documents she photographed, or both.[5]

The state advised the trial court that the information regarding Ms. Frenzel's testimony and her discoveries was supplied to the defendant over a year prior to trial. However, the defendant argued that he had just learned of the ground for suppression. He told the trial court:

> **MR. CASANAVE**: Your Honor, based on things that I recently learned regarding this case and the nature of when Mr. Vail was arrested in Texas, etcetera, it seems that Ms. Gina Frenzel - - Frenzel, whatever it is - - was essentially working with law enforcement.
>
> She knew to be there when they arrested him. She asked questions of Mr. Vail at the time he's being arrested, so she was in on it. And then she went into his house and searched and took pictures of things.
>
> It's my position that at that point, considering she was working in concert with law enforcement, she was an agent of the government, and therefore, is subject to the Fourth Amendment, and it's an illegal, warrantless search.

The state, however, argued that the motion to suppress was untimely filed pursuant to La.Code Crim.P. art. 521. Louisiana Code of Criminal Procedure Article 521, in pertinent part, provides:

> A. Pretrial motions shall be made or filed within fifteen days after arraignment, unless a different time is provided by law or fixed by the court at arraignment upon a showing of good cause why fifteen days is inadequate.
>
> B. Upon written motion at any time and showing of good cause, the court shall allow additional time to file pretrial motions.

---

[5]There is no motion to suppress Mr. Frenzel's testimony or the documents presented during her testimony in the record before this court.

Specifically regarding motions to suppress, La.Code Crim. P. art. 703, provides in pertinent part:

>    A. A defendant adversely affected may move to suppress any evidence from use at the trial on the merits on the ground that it was unconstitutionally obtained.
>
>    . . . .
>
>    C. A motion filed under the provisions of this Article must be filed in accordance with Article 521, unless opportunity therefore did not exist or neither the defendant nor his counsel was aware of the existence of the evidence or the ground of the motion or unless the failure to file the motion was otherwise excusable. The court in its discretion may permit the filing of a motion to suppress at any time before or during the trial.

The defendant argued that although he had information regarding Ms. Frenzel's testimony and items she photographed in the defendant's house a long time prior to trial, he had just learned that she was working for the state to gather evidence against him.

>    **MR. CASAVAVE**: Your Honor, until – first of all, it's a constitutional issue, and 521 does not, you know, void the constitution.
>
>    Second of all, Ms. Frenzel's direct involvement with police in the arrest and subsequent search did not come to my attention based on something I was given in discovery, it was based on something that I figured out after watching a reported video of something that was broadcast, you know.
>
>    And it was broadcast, the same - - you know, later in the day that we had our hearing that I was on Skype. I saw it sometime after that. And you know, it's - - is the normal time for filing pretrial motions under the Code of Criminal Procedure passed? Yes.
>
>    Does that apply to the Fourth Amendment? No.
>
>    And does that apply to information received after the deadline passed? I hope not.

The defendant does not substantiate the allegation that Ms. Frenzel was working directly with the police on the defendant's arrest and the subsequent

48

search of his residence. Ms. Frenzel testified that she was not working for the police or anyone else, nor had she had contact with any law enforcement agency prior to the defendant's arrest. The defendant conceded that he had been informed that Ms. Frenzel would testify months prior to trial and of the exhibits that the state would produce during trial. Months prior to trial, the defendant had all of the information he claimed he just learned. Ms. Frenzel had a key to his property. He knew what documents she located when the state supplied him with the list of exhibits it intended to present at trial. The defendant knew Ms. Frenzel was present when he was arrested, and he learned through discovery that Ms. Frenzel was investigating the case along with Mr. Mitchell.

While the state has the burden of proving the admissibility of evidence, the defendant has the burden of proving the ground for his motion to suppress. La.Code Crim.P. art. 703(C). In the instant case, the defendant's vague and generalized allegation that Ms. Frenzel was an agent of the police was insufficient to initiate a motion to suppress or to support an untimely filed motion to suppress. *See State v. Thomas,* 467 So.2d 883 (La.App. 2 Cir. 1985). Louisiana Code of Criminal Procedure Article 703(E)(1) provides, in pertinent part, that "[a]n evidentiary hearing on a motion to suppress shall be held only when the defendant alleges facts that would require the granting of relief."

In brief, the defendant attempts to associate Ms. Frenzel with Jerry Mitchell, who, he alleges, was investigating the case for the police. This assertion is based on Ms. Frenzel agreeing during cross-examination that perhaps she was working in "concert" with Mr. Mitchell because she had offered to help with his investigation. However, there was no evidence presented at trial or otherwise to indicate that Mr. Mitchell was working for or with the police.

The defendant failed to establish good cause for filing an untimely motion to suppress evidence in this case. The hearing referred to by defense counsel was on July 29, 2016, ten days prior to trial. The defendant had sufficient time to prepare an adequate and specific motion to suppress but failed to do so. "The trial court is afforded great discretion when ruling on a motion to suppress, and its ruling will not be disturbed absent abuse of that discretion." *State v. Lee*, 05-2098, p. 15 (La. 1/16/08), 976 So.2d 109, 123. In *State v. Cleary,* 262 La. 539, 263 So.2d 882 (La.1972), the supreme court found no abuse of discretion when the trial denied a late and generic oral motion to suppress.

This assignment of error has no merit.

## ASSIGNMENT OF ERROR NUMBER SIX

The defendant asserts that the fifty-four year delay from the time of Mary Vail's death to his indictment was prejudicial and violated his due process right to a fair trial.

The defendant filed a "Motion to Quash Indictment—Prejudicial Pre-Indictment Delay and Memorandum of Law." In the motion, he alleged that his right to a speedy trial was violated via the Sixth and Fourteenth Amendments.

In *State v. Batiste*, 05-1571, pp. 6-7 (La. 10/17/06), 939 So.2d 1245, 1250, the supreme court discussed the right to a speedy trial:

> The constitutional right to a speedy trial is imposed upon the states by the Due Process Clause of the Fourteenth Amendment. *Klopfer v. North Carolina,* 386 U.S. 213, 223, 87 S.Ct. 988, 993, 18 L.Ed.2d 1 (1967). The underlying purpose of this constitutional right is to protect a defendant's interest in preventing pretrial incarceration, limiting possible impairment of his defense, and minimizing his anxiety and concern. *Barker v. Wingo,* 407 U.S. 514, 515, 92 S.Ct. 2182, 2184, 33 L.Ed.2d 101 (1972). The Supreme Court has set forth the following four factors for courts to consider in determining whether a defendant's right to a speedy trial has been violated: (1) the length of the delay; (2) the reasons for the delay; (3) the accused's assertion of his right to speedy trial; and (4) the prejudice to the accused resulting from the delay. *Id.* at 531-532, 92 S.Ct. at 2192-93;

*see also State v. Reaves*, 376 So.2d 136 (La.1979) (adopting *Barker* factors). The specific circumstances of a case will determine the weight to be ascribed to the length of and reason for the delay because "the delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge." *Reaves,* 376 So.2d at 138 (quoting *Barker,* 407 U.S. at 531, 92 S.Ct. at 2192).

In the current case, the defendant asserted that "the delay between November 4, 1962 and June 27, 2013, was caused by the STATE with a twofold purpose: to strengthen the prosecutor's case and to weaken the defendant's case and his ability to defend." The defendant reiterates this contention in brief to this court.

At the hearing on the defendant's motion, held on July 29, 2016, he argued:

[H]ere the State has chosen to use that right as to when to commence - - to commence this prosecution - - when, where, and what to prosecute, by waiting 54 years to prosecute Felix Vail for a death that was ruled an accident by a coroner in 1962 and subsequently revised and given the umbrella coverage of a homicide in 2013.

This delay by the prosecution represents an undue delay, continued harassment of Mr. Vail in the form of numerous investigations yielding no evidence supporting the State's allegation of homicide, extensive national media coverage of the case as well.

Your Honor, this coverage has been pervasive and continuous. It is also incredibly numerous in sheer amount.

Your Honor, the - - our motion contains an outline of the crucial evidence lost or destroyed by the State. Furthermore, witnesses have died or otherwise unavailable, all of which unduly prejudices Mr. Vail in presenting his defense.

The defendant continued to argue the matter went beyond a speedy trial consideration. He asserted that because of the extreme delay, not only did he suffer great prejudice but he has suffered mentally and emotionally throughout the years. The defendant argued that the United States Supreme Court has held the Sixth Amendment provided protection for defendants arising out of a prejudicial pre-indictment delay.

The state argued that although it finally had sufficient evidence in 2012, there was only a pre-indictment delay of one year. Prior to that time, there was insufficient evidence to establish probable cause to arrest him for the murder of his wife. The state argued that it had an ethical and legal duty not to prosecute until there was probable cause to charge the defendant with the crime.

Following the hearing, the trial court ruled that the state had not been the cause of the delay to prosecute in this case. "I find no evidence that it is a deliberate strategy. Quite honestly, I find that the prejudice, if any, probably weighs more heavily on the state than it does on Mr. Vail."

At the hearing and in brief, the defendant relied heavily on *United States v. Marion*, 404 U.S. 307, 92 S.Ct. 455 (1971). At the hearing, the defendant read passages to the trial court from a concurring opinion of Justices Douglas, Brennan, and Marshall. One such passage read was as follows:

> The duty which the Sixth Amendment places on Government officials to proceed expeditiously with criminal prosecutions would have little meaning if those officials could determine when that duty was to commence. To be sure, "[t]he right of a speedy trial is necessarily relative. It is consistent with delays and depends upon circumstances." Bevers v. Hauber, 198 U.S. 77, 87, 25 S.Ct. 573, 576, 49 L.Ed. 950 (1905). But it is precisely because this right is relative that we should draw the line so as not to condone illegitimate delays whether at the *pre-* or the *post*-indictment stage.

*Id.* at 332. Citing *Marion*, the defendant argues that "[p]assage of time, whether before or after arrest, may impair memories, cause evidence to be lost, deprive the defendant of witnesses, and otherwise interfere with his ability to defendant himself." *Id*. at 321-22.

However, in *United States v. Lovasco,* 431 U.S. 783, 97 S.Ct. 2044 (1977), the defendant was charged with dealing firearms without a license more than eighteen months after the offense was alleged to have occurred. He moved to dismiss the indictment due to the pre-indictment delay, alleging that the delay was

unnecessary and prejudicial to his defense. Two witnesses vital to the defendant's

defense had died in the interim. The lower courts found the delay to be

unnecessary and unreasonable and dismissed the indictment. Upon granting

*certiorari,* the United States Supreme Court reversed the lower courts' rulings,

stating:

> In *United States v. Marion*, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971), this Court considered the significance, for constitutional purposes, of a lengthy preindictment delay. We held that as far as the Speedy Trial Clause of the Sixth Amendment is concerned, such delay is wholly irrelevant, since our analysis of the language, history, and purposes of the Clause persuaded us that only "a formal indictment or information or else the actual restraints imposed by arrest and holding to answer a criminal charge . . . engage the particular protections" of that provision. *Id.*, at 320, 92 S.Ct., at 463. We went on to note that statutes of limitations, which provide predictable, legislatively enacted limits on prosecutorial delay, provide "'the primary guarantee, against bringing overly stale criminal charges.'" *Id.*, at 322, 92 S.Ct., at 464, quoting *United States v. Ewell,* 383 U.S. 116, 122, 86 S.Ct. 773, 777, 15 L.Ed.2d 627 (1966). But we did acknowledge that the "statute of limitations does not fully define (defendants') rights with respect to the events occurring prior to indictment," 404 U.S., at 324, 92 S.Ct., at 465, and that the Due Process Clause has a limited role to play in protecting against oppressive delay.

> Respondent seems to argue that due process bars prosecution whenever a defendant suffers prejudice as a result of preindictment delay. To support that proposition respondent relies on the concluding sentence of the Court's opinion in *Marion* where, in remanding the case, we stated that "(e)vents of the trial may demonstrate actual prejudice, but at the present time appellees' due process claims are speculative and premature." *Id.*, at 326, 92 S.Ct., at 466. But the quoted sentence establishes only that proof of actual prejudice makes a due process claim concrete and ripe for adjudication, not that it makes the claim automatically valid. Indeed, two pages earlier in the opinion we expressly rejected the argument respondent advances here:

>> "(W)e need not . . . determine when and in what circumstances actual prejudice resulting from preaccusation delays requires the dismissal of the prosecution. Actual prejudice to the defense of a criminal case may result from the shortest and most necessary delay; and no one suggests that every delay-caused detriment to a defendant's case should abort a criminal prosecution." *Id.*, at 324-325, 92 S.Ct., at 465. (Footnotes omitted.)

Thus *Marion* makes clear that proof of prejudice is generally a necessary but not sufficient element of a due process claim, and that the due process inquiry must consider the reasons for the delay as well as the prejudice to the accused.

. . . .

It requires no extended argument to establish that prosecutors do not deviate from "fundamental conceptions of justice" when they defer seeking indictments until they have probable cause to believe an accused is guilty; indeed it is unprofessional conduct for a prosecutor to recommend an indictment on less than probable cause. It should be equally obvious that prosecutors are under no duty to file charges as soon as probable cause exists but before they are satisfied they will be able to establish the suspect's guilt beyond a reasonable doubt. To impose such a duty "would have a deleterious effect both upon the rights of the accused and upon the ability of society to protect itself," *United States v. Ewell, supra,* 383 U.S., at 120, 86 S.Ct., at 776. From the perspective of potential defendants, requiring prosecutions to commence when probable cause is established is undesirable because it would increase the likelihood of unwarranted charges being filed, and would add to the time during which defendants stand accused but untried. These costs are by no means insubstantial since, as we recognized in *Marion*, a formal accusation may "interfere with the defendant's liberty . . . . disrupt his employment, drain his financial resources, curtail his associations, subject him to public obloquy, and create anxiety in him, his family and his friends." 404 U.S., at 320, 92 S.Ct., at 463. From the perspective of law enforcement officials, a requirement of immediate prosecution upon probable cause is equally unacceptable because it could make obtaining proof of guilt beyond a reasonable doubt impossible by causing potentially fruitful sources of information to evaporate before they are fully exploited. And from the standpoint of the courts, such a requirement is unwise because it would cause scarce resources to be consumed on cases that prove to be insubstantial, or that involve only some of the responsible parties or some of the criminal acts. Thus, no one's interests would be well served by compelling prosecutors to initiate prosecutions as soon as they are legally entitled to do so.

*Id*. at 788-92 (footnotes omitted).

While the above two cases involved crimes that were subject to prescriptive periods for the purposes of instituting prosecution, in the current case, there is no prescriptive period. La.Code Crim.P. art. 571. "In the absence of a statute of limitations, the state retains the right to prosecute for crimes indefinitely." *State v. Ferrie*, 144 So.2d 380, 384 (La.1962).

In brief, the defendant points out that at the time of Mary Vail's death, the state possessed the police reports and the summary of statements of at least twenty witnesses, the defendant's handwritten and signed statements, and physical evidence, including the autopsy report, and the grand jury found no true bill. At the hearing on the motion to quash the indictment, the defendant pointed out that Detective Authement and Assistant District Attorney James Babin went out to California to interview the defendant's son and Sharon Hensley regarding the allegation the defendant killed Mary Vail, and no indictment resulted from that attempt to prosecute the defendant. At the hearing, the defendant argued:

> They waited 54 years. Mr. Vail was - - the indictment was pretermitted in 1962. There have been numerous district attorneys in office since then that have not brought this, even though there was a continuing investigation. A cold case file existed in this parish in some form or another at least through the middle of the 2000s. This was an ongoing matter.
>
> It took a reporter to bring to their attention that, I would like this publicity, I want justice, I want this done, you should indict him. And they decided, okay, we'll indict, we will - - we will go and we will collect some newspaper clippings, we will collect documents from people and we will then bring an indictment. An indictment was rendered by the grand jury.
>
> But that doesn't explain the delay, Judge.

In the current case the long delay and failure to indict was caused by the 1962 certification of death which listed the cause of Mary Vail's death as drowning and the manner of death as accidental. During the several years following Mary Vail's death, two mothers searched desperately for their missing daughters, who were both connected to, and last seen by, the defendant. Mary Carver filed missing person reports on her daughter in Texas and contacted the defendant's family in Mississippi and Ms. Hensley's family in North Dakota. She learned of the suspicious death of the defendant's first wife. Eventually, Ms. Carver contacted an investigative journalist who took an interest in the case and began an investigation.

Then in 2012, Dr. Welke, a forensic pathologist and coroner for Calcasieu Parish, saw pictures of Mary Vail taken immediately upon her body being retrieved from the water, reviewed the autopsy report, and determined convincingly that Mary Vail was murdered. Furthermore, because of the investigative journalists' work, three witnesses came forward with information regarding statements the defendant made about killing his wife. At that point, the state had probable cause to present the evidence to the grand jury after fifty-two years.

In *State v. Smith*, 01-1027 (La.App. 1 Cir. 2/15/02), 809 So.2d 556, the defendant was indicted for aggravated rape which took place twenty-one years prior to the indictment. The defendant filed a motion to quash the indictment for, among other reasons, an undue twenty-one year pre-indictment delay. He argued that the lengthy delay deprived him of the possibility of an alibi since he could no longer remember where he was or what he did so many years ago or to assemble witnesses. He further argued he was deprived of effective counsel because of the time element; defense counsel would be unable to present a defense. While stating that *Marion*, 404 U.S. 307, held that the speedy trial right was not invoked until an accused was either arrested or indicted, the first circuit noted that pre-indictment delays were analyzed by due process, which was to "measure the government's justification for the delay against the degree of prejudice suffered by the accused." *Id.* at 560. The first circuit went on to discuss the difference between a tactical delay and an investigative delay in pre-indictment matters, as follows:

> To show a violation of due process from preindictment tactical delay, a defendant must show that the government deliberately delayed bringing the indictment in order to gain a tactical advantage and that the delay caused the defendant actual and substantial prejudice in presenting his defense. *State v. Dickerson*, 529 So.2d 434, 439 (La.App. 1st Cir.), *writ denied*, 533 So.2d 353 (La.1988). *See also United States v. Lovasco,* 431 U.S. 783, 795 n. 17, 97 S.Ct. 2044, 2051 n. 17, 52 L.Ed.2d 752 (1977); *Marion*, 404 U.S. at 324, 92 S.Ct. at 465; *State v. Hughes*, 94-1364, p. 6 (La.App. 4th Cir.12/28/94), 648

So.2d 490, 493, *writ denied,* 95-0255 (La.3/24/95), 651 So.2d 292. In *Lovasco,* the U.S. Supreme Court held "that to prosecute a defendant following investigative delay does not deprive him of due process, even if his defense might have been somewhat prejudiced by the lapse of time." 431 U.S. at 796, 97 S.Ct. at 2051-52.

To prove prejudice resulting from tactical delay, the defendant's showing must be concrete, not speculative. Vague and conclusory allegations of prejudice resulting from the passage of time and the absence of witnesses are insufficient to constitute a showing of actual prejudice. *See Dickerson,* 529 So.2d at 439-40 (quoting *United States v. Antonino*, 830 F.2d 798, 805 (7th Cir.1987)). In *Dickerson*, this court placed on the defendant the burden of establishing the government deliberately delayed bringing the indictment in order to gain a tactical advantage. In *Schrader*, the Louisiana Supreme Court, in balancing the reasons for the delay with the resulting prejudice, noted that the state had offered no evidence regarding the reasons for the delay. 518 So.2d at 1028. Such a comment appears to require the state, not the defense, to show the reasons for the delay. Even if the state has an obligation to present its reasons for the delay, the defense has the ultimate burden of proving bad faith on the part of the state.

In *Schrader,* there was an almost 15-year delay between the offense (a murder resulting from arson) and the indictment. The court found no prejudice resulting from the defendant's inability to examine the site as it existed after the fire. The court explained that the defendant was able to present testimony from both of the men who originally investigated the blaze. The court also noted that witnesses who had heard the defendant's threat to burn down the house did not tell the authorities about those threats until after the defendant's arrest.

In the instant case, the offense allegedly occurred in November of 1976, and the indictment was issued in September of 1996. The reason for the state's almost twenty-year delay in filing the indictment is not evident from the record, and it is not clear when the authorities became aware of the alleged rape. The victim's medical records (filed under seal) indicate that, before the rape was reported to the authorities, the victim had told her mother and two friends about the rape. In 1996, the victim was "confronted" about the rape after defendant was arrested for or suspected of molesting his daughter.

Relator made no attempt to introduce any evidence at the hearing or offer any factual allegations about how he has been actually prejudiced by the delay. His allegations in the writ application speculate that he "may not have any significant memory of that period of his life," that he "may not remember who would or would not be a good witness on his behalf," that the "[victim] has almost no memory of the events," and that his attorney would not be able to test the victim's memory as to the surrounding events, such as clothing worn, time of day, exact location, presence of others, health

or emotional problems, medication, weather, and other facts relator thinks will impact on the victim's credibility.

*Id.* at 560-61.

A review of the police investigation report fairly established that the defendant benefited from the passage of time in this case. All of the witnesses' statements, many of whom reported that the defendant was abusive towards his wife and was capable of killing her, were lost, and seemingly all of the witnesses interviewed were either deceased or could not be located. Furthermore, the defendant failed to show how his mental or emotional health was affected by the pre-indictment delay in this case. The defendant's allegations of prejudice are insufficient to support a due process violation based on pre-indictment delay. *See Marion*, 404 U.S. 307. Thus, the state's reasons for delaying the institution of prosecution in this case were reasonable, and the defendant has failed to meet his burden of establishing prejudice from the delay or that his due process rights were violated.

There is no merit to this assignment of error.

### ASSIGNMENT OF ERROR NUMBER SEVEN

The defendant in his final assignment of error, argues the trial court did not have authority to sentence him to life imprisonment. He contends that he should have received the maximum sentence for the lesser included offense of manslaughter. He asserts that the life sentence was an *ex post facto* application of the law and therefore an illegal sentence.

The defendant was convicted of murder. At the time of the offense in 1962, murder was defined, in pertinent part, as "the killing of a human being, (1) when the offender has a specific intent to kill or to inflict great bodily harm[.]" The punishment for murder was death.

On September 21, 2016, the defendant filed a "Motion and Memorandum Regarding Sentencing," and the state filed a "State's Opposition to the Defendant's Motion and Memorandum Regarding Sentencing" on September 22, 2016. The defendant was sentenced on September 26, 2016, to life imprisonment. On September 29, 2016, the defendant filed a "Motion to Reconsider Sentence," which was denied without a hearing.

At the sentencing hearing, the defendant argued that the trial court did not have the authority to sentence the defendant to life imprisonment for the reason that in 1972, the United State Supreme Court ruled that mandatory death penalties were unconstitutional. *See Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726 (1972). The defendant argued that the lesser included criminal homicide at the time of the offense of murder was manslaughter, which at the time imposed a sentence of zero to twenty-one years and was the only lawful sentence the defendant could receive. The defendant contends that this court should vacate the illegally imposed sentence of life imprisonment and remand the matter to the trial court with instructions to resentence the defendant in accordance with the sentencing provision provided for manslaughter at the time of the offense.

The state, however, asserts that the defendant "falsely" interpreted *Furman v. Georgia* to mean that "he could only be sentenced for the crime of manslaughter." The state argues:

> In *Furman*, the United States Supreme Court invalidated the capital sentences of various defendants because of the purportedly discriminatory manner in which they were imposed. *Furman* did not invalidate sentences of life imprisonment for murder----it actually encouraged them instead of the death penalty. See for instance, ". . . .there is no reason to believe that it [the death penalty] serves any penal purpose more effectively that the less severe punishment of imprisonment." *Furman*, 408 U.S. at 305, 92 S.Ct. at 2760.

The above arguments were made to the trial court at sentencing. The trial court sentenced the defendant to life imprisonment and stated for the record:

> If the sentence were taking place contemporaneously with the event that occurred in 1962 the sentencing would be much simpler but much more dire, of course. Death penalty was on the table in 1962.
>
> . . . .
>
> I recognize the previous issues presented by the law that was in place in 1962, but then for me to sentence him to something less than life would be to sentence him to something that he was not convicted of. He was convicted of murder.

The defendant relies on *State v. Craig,* 340 So.2d 191 (La.1976), to support his proposition that whereas the mandatory death penalty in 1962 for the offense of murder was ruled unconstitutional, the trial court in the current case should have sentenced the defendant to the maximum sentence for the next lesser included offense, which was manslaughter. However, in *Craig,* the circumstances were not the same as in the present case. The defendant was convicted of aggravated rape in November 1974 and sentenced to death. However, the supreme court vacated the sentence and remanded for resentencing the defendant to the most serious penalty for the next lesser included offense. The supreme court's explanation of why the defendant in *Craig* would receive a much lesser sentence than life imprisonment distinguishes the defendant's circumstances from the situation in *Craig,* as follows:

> While we affirm Craig's conviction, we must remand for resentencing. In *Roberts v. Louisiana*, 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976), the United States Supreme Court declared Louisiana's mandatory death penalty for first degree murder unconstitutional, because the jury is given no chance to consider aggravating or mitigating circumstances:
>
>> 'The constitutional vice of mandatory death sentence statutes--lack of focus on the circumstances of the particular offense and the character and propensities of the offender--is not resolved by Louisiana's limitation of first-degree murder to various categories of killings. The diversity of circumstances presented in cases falling within the single category of killings during the

commission of a specified felony, as well as the variety of possible offenders involved in such crimes, underscores the rigidity of Louisiana's enactment and its similarity to the North Carolina statute. Even the other more narrowly drawn categories of first-degree degree murder in the Louisiana law afford no meaningful opportunity for consideration of mitigating factors presented by the circumstances of the particular crime or by the attributes of the individual offender.' 428 U.S. 325, at page 333, 96 S.Ct. 3001, at page 3006.

Louisiana's mandatory death penalty for aggravated rape suffers the same constitutional infirmities. The jury is given no opportunity to consider mitigating or aggravating circumstances. Therefore, the death penalty for aggravated rape is unconstitutional under *Roberts v. Louisiana, supra*.

The defendant has thus been convicted of a crime whose penalty has been declared unconstitutional. This problem is not a new one, however. After the United States Supreme Court decision in *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), which declared the death penalty as then applied unconstitutional, this court remanded murder and rape cases where death had been imposed for resentencing to life imprisonment. *See e.g. State v. Franklin,* 263 La. 344, 268 So.2d 249 (1972), a murder case; *State v. Singleton*, 263 La. 267, 268 So.2d 220 (1972), an aggravated rape case. The precedent for such action had been established in *State v. Shaffer*, 260 La. 605, 257 So.2d 121 (1971), where the problems were discussed, and *State v. Duplessis*, 260 La. 644, 257 So.2d 135 (1971), following the reversal by the United States Supreme Court of our judgment 'insofar as it imposes the death sentence' for a 'Witherspoon' violation. *Duplessis v. Louisiana*, 403 U.S. 946, 91 S.Ct. 2282, 29 L.Ed.2d 856 (1971).

However, a different situation exists now than at the time of *Franklin* and *Singleton, supra*. At the time those cases were decided, C.Cr.P. 814 provided for a responsive verdict of 'guilty without capital punishment' for murder and aggravated rape. C.Cr.P. 817, at that time, also authorized the 'qualified' verdict of 'guilty without capital punishment,' in which case the sentence would be life imprisonment. Thus, reasoning that the responsive verdict of guilty without capital punishment was the next authorized verdict for the crime, we remanded for resentencing as if that verdict has been returned, and, under C.Cr.P. 817, life imprisonment was called for.

The situation has changed. In an attempt to overcome *Furman's* objections to the death penalty, the legislature amended the murder statute to provide for first and second degree murder, making death mandatory for first degree murder. Likewise, the death penalty for aggravated rape was mandatory. To accomplish this, the legislature amended C.Cr.P. 814 to do away with the responsive

verdict of 'guilty without capital punishment' for first degree murder and aggravated rape. Thus, at the time this crime was committed, November 26, 1974, the only responsive verdicts to a charge of aggravated rape were guilty; guilty of attempted aggravated rape; guilty of simple rape; not guilty. Additionally, C.Cr.P. 817 was amended to delete the provision authorizing the qualifying verdict 'guilty without capital punishment.' Thus there is no longer any authority for us to remand an aggravated rape case for resentencing to life.

> At the time (November 26, 1974) this crime was committed, attempted aggravated rape was punishable by imprisonment for not more than twenty years. R.S. 14:27 D(1). Simple rape carried a penalty of one to twenty years. R.S. 14:43. Thus, following the reasoning of *Franklin* and *Singleton, supra*, we remand this case for resentencing of defendant to the most serious penalty for the next lesser included offense. The legislature obviously intended to impose the most serious penalty available under the law. In this case, although there is a range of from one to twenty years, the most serious penalty is twenty years at hard labor.

*Id*. at 193-94.

While *Furman* invalidated the death penalty, it did not invalidate the murder statute or life imprisonment as a sentence. In many post-*Furman* cases, the Louisiana Supreme Court imposed a life sentence on all those convicted under the former murder statute. In *State v. Franklin*, 268 So.2d 249 (La.1972), *overruled on other grounds by State v. Tharp*, 284 So.2d 536 (La.1973), the defendant was convicted of murder and sentenced to death. However, while on appeal, *Furman* was decided. The *Franklin* court stated:

> After this appeal was taken, the United States Supreme Court decided *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), and related cases. Under these decisions, concerning statutes like Louisiana's (La.R.S. 14:30 and La.C.Cr.P. Art. 817), where the jury has the discretion to impose the death [penalty] instead of a lesser penalty for a crime, our nation's highest court held: '* * * that the imposition and carrying out of the death penalty in these cases constitutes cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments. The judgment in each case is therefore reversed insofar as it leaves undisturbed the death sentence imposed, and the cases are remanded for further proceedings.' 408 U.S. 239, 92 S.Ct. 2727.

In accordance with *Furman*, therefore, the imposition of the death penalty herein must be reversed, even though we may affirm the conviction.

With regard to the capital penalty, we regard the present situation to be analogous to that resulting from the decisions of the United States Supreme Court in *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968) and related cases. In them, the high court invalidated death penalties because of the exclusion of prospective jurors who had only general conscientious scruples against the infliction of capital punishment. In such instances, although the death penalty was invalidated, the state convictions for which the penalty was imposed were allowed to stand.

In Louisiana, where a death penalty was imposed by a jury selected in violation of *Witherspoon*, this court has affirmed the conviction but has remanded the case to the trial court, with instructions to the judge to sentence the defendant to life imprisonment. *State v. Shaffer*, 260 La. 605, 257 So.2d 121 (1971); *State v. Duplessis*, 260 La. 644, 257 So.2d 135 (1971). Accordingly, we will afford similar disposition to cases such as the present, in which the death penalty has been imposed in violation of *Furman,* if we affirm the conviction.

*Id.* at 250-51.

In *State v. Simmons*, 381 So.2d 803 (La.1980), *cert. denied,* 431 U.S. 917, 97 S.Ct. 2180 (1977), the defendant was convicted of murder in 1963 and sentenced to death. In 1968, the defendant escaped from prison but was apprehended in 1978. The defendant was granted an out-of-time appeal in 1979. The supreme court affirmed the conviction for murder and further noted:

Article 30 of the Criminal Code prescribing the death penalty, as it existed at the time of this offense, was rendered unconstitutional by the decision of the United States Supreme Court in *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). In keeping with our decisions in like situations, Simmons' death penalty must be set aside and the case must be remanded to the trial court with instructions to sentence defendant to imprisonment for life. *State v. Franklin*, 263 La. 344, 268 So.2d 249 (1972).

*Id.* at 807.

In the current case, as discussed at length in *Craig,* 340 So.2d 191, at the time of the offense, the jury had the option to qualify the verdict of murder with the

addition of "without capital punishment" in which a defendant would be imprisoned for life at hard labor. *See State v. DePietro*, 148 So.2d 593 (La.1963). Accordingly, considering the above jurisprudence, the trial court in the current case did not err when it sentenced the defendant to life imprisonment.

Finally, the defendant is correct in that it is generally settled that the law in effect at the time of the commission of the offense is determinative of the penalty which is to be imposed upon the convicted accused. *See State v. Narcisse,* 426 So.2d 118 (La.), *cert. denied*, 464 U.S. 865, 104 S.Ct. 202 (1983). However, there is no *ex post facto* violation in this case. *Ex post facto* laws are prohibited by not only the Louisiana Constitution but also the United States Constitution. U.S. Const. art. I, §§ 9 & 10; La. Const. art. I, § 23. "This prohibition extends to the enforcement of any enactment which changes the punishment to inflict a greater penalty for the crime than that authorized for the crime at the time of its commission." *State v. Robinson*, 423 So.2d 1053, 1063 (La.1982). The defendant received a lesser sentence in this case which was authorized by law.

This assignment of error is without merit.

### SUMMARY

The defendant was convicted of second degree murder. The defendant claimed that he had taken his wife, Mary Horton Vail, night fishing on the Calcasieu River and she fell overboard and accidently drowned. While the 1962 autopsy report did not list either the manner or cause of death, the certificate of death listed the cause of death as drowning and the manner of death as accidental. However, in 2016, two forensic pathologists testified that Mary Vail did not drown but was killed prior to going into the water. A number of fact witnesses testified. The evidence was largely circumstantial, although three witnesses testified that the defendant had stated to them that he had killed his wife. There was also evidence

admitted that established in the following years, two women, one a girlfriend of the defendant and another a wife, disappeared under mysterious circumstances, and the defendant was the last person to ever see them. The evidence was sufficient to sustain the verdict of second degree murder beyond a reasonable doubt. Additionally, the defendant failed to identify what specific objection was made on the record to the jury instructions. Without a contemporaneous objection this court will not consider this assignment of error. The trial court did not err when it permitted the state to perpetuate two witnesses' testimonies for the purpose of trial. Nor did the trial court err when it denied the defendant's motion to suppress items located and photographed in the defendant's house by a private investigator since the motion to suppress was untimely filed, and the defendant failed to establish good cause for the untimeliness of the motion. Any pre-indictment delay did not violate the defendant's right to due process under the law for the reason the delay was not caused by the state and was not prejudicial to the defendant's defense. Finally, the trial court had the authority to impose life imprisonment on the conviction for a murder committed in 1962.

## CONCLUSION

For all of the above reasons, this court affirms the defendant's conviction and sentence. The trial court is hereby instructed to correctly advise the defendant of the provisions of La.Code Crim.P. art. 930.8 by sending appropriate written notice to the defendant within ten days of the rendition of this opinion and to file written proof in the record that the defendant received the notice. Additionally, the trial court is hereby instructed to correct the court minutes of sentencing to reflect that the defendant's sentence was imposed at hard labor.

**CONVICTION AND SENTENCE AFFIRMED WITH INSTRUCTIONS.**